In re TABLE TALK, INC., Debtor.

Bankruptcy No. 4–82–00253–G.

United States Bankruptcy Court,
D. Massachusetts.

Aug. 27, 1982.

Edward F. McHugh, Jr., Nutter, McClennan & Fish, Boston, Mass., for Creditors Committee.

Jon Schneider, Goodwin, Procter & Hoar, Boston, Mass., for Greenstreet Properties.

Leonard Salter, Wasserman & Salter, Boston, Mass., Barry N. Seidel, Levin & Weintraub, New York City, for Table Talk, Inc.

Bruce Daniels, Boston, Mass., U. S. trustee.

MEMORANDUM AND ORDER ON MOTION FOR THE APPOINTMENT OF AN EXAMINER

PAUL W. GLENNON, Bankruptcy Judge.

This matter came before the court on the motion of the United States trustee for an order authorizing the appointment of an examiner pursuant to 11 U.S.C. § 151104.

At the outset of the hearing the assistant United States trustee ("trustee") stated that he was proceeding exclusively under subsection (b)(1) of section 151104. That section provides:

(b) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in inter-

est, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate;

. . .

The trustee's motion alleges, in relevant part, the following:

3. The financial information submitted by the debtor indicates that the debtor is incurring a continuing operation loss post-petition, which is depleting the assets of the estate.

4. The United States Trustee has conducted several meetings of creditors under the authority of 11 U.S.C. Section 341(a). The debtor's reports at said meetings have not indicated that a Plan was either under consideration or viable.

5. An investigation is necessary into the acts, conduct, property, liability, and financial condition of the debtor, as well as the operation of its business and the desirability of the continuance thereof . . . .

7. The appointment of an Examiner is in the best interest of the creditors in order to investigate the aforementioned conduct of the debtor, to examine and appraise the condition and worth of the debtor's inventory, equipment and machinery, and ultimately to report on the feasibility and desirability of the continued operations of this debtor.

The court received evidence consisting of the testimony of the president of the debtor and of the treasurer/controller of the debtor and heard oral argument of the assistant United States trustee, counsel to the unsecured creditors' committee, and co-counsel to the debtor. Memoranda were filed by the trustee, the creditors' committee, and the debtor. For the reasons set out below, I am denying the trustee's motion.

## FACTS

Table Talk, Inc. filed a petition under chapter 11 of the Bankruptcy Code on April 5, 1982. No trustee or examiner has been appointed in this case. Table Talk is engaged in the business of baking and distributing pies and other pastry products in the Northeast and has been in this business about fifty (50) years. The business is seasonal in nature, the winter months, most particularly November and December, being profitable, and the other months being generally unprofitable. Up through 1979 the fourth quarter had always been profitable. Through 1977 it had been sufficiently profitable to offset the losses of the unprofitable months and to create an annual net profit. However, 1977 was the most recent year in which the company was profitable.

Table Talk was purchased by its present owner, Texas General Corporation of New England ("Texas General"), in December of 1980. It has had two presidents since the acquisition. The first president served until his service was terminated by the Board some time in the fall of 1981. The current president, Ronald L. Chevrier, came to Table Talk in March of 1982. In the interim, apparently a consultant and Steve Karol [1] served as chief operating officers.

Texas General's business plan for Table Talk was directed toward significant growth from business areas not emphasized by Squibb Corporation, the previous owner. The plan included expansion of the sale of outside purchase items through Table Talk's distribution system, the expansion of the thrift store operation, and the development of certain new products.

The first management team made some business decisions that turned out, in retrospect, to be disastrous. The approximately 100 distribution routes in New York and New Jersey were discontinued in the fall of

---

1. The Board is controlled by the Karol family. Four of the six members are Karols, including the treasurer/controller. The other two members are the president and the vice-president.

1981. The result of this decision was that the company no longer had the volume it needed to cover overhead. The profitable volume of restaurants had been lost. Management had used an ax where only a pruning shears was required. Losses also rose as a result of poor implementation of the decision to introduce "outside purchase" items. The necessary preliminary work of securing space in the stores for the placement of the new items was not adequately accomplished with the result that the products were returned by the delivery personnel and the supplier, a major New England account, was dissatisfied.

The task of the consultant who was associated with Table Talk, apparently sometime during the winter of 1981–82, was to identify the products Table Talk should produce, where and how it should distribute them, how many the company would actually sell, and finally to compare the fixed costs with the projected sales.

The current president, Ronald L. Chevrier, came to Table Talk about a month before the filing of the chapter 11 petition. His background includes experience in marketing of similar food products and management experience in similar operations. In the four to five months Chevrier has been heading Table Talk, he has taken steps to improve the financial picture. An experienced food broker has been hired to promote sales. Chevrier has reduced the number of distribution routes by eliminating the smaller stops which have the highest cost of doing business. A contract with a new private label account is in place which Chevrier expects to produce a million dollars in sales this year and five million dollars in sales annually. Promotions of Table Talk products have been conducted at a profit. He has focused on a product line (frozen) in which the market potential is good and which takes advantage of the fact

that Table Talk is closer to the New England market than is its major competitors. The pricing of products is being adjusted to reflect more accurately the cost of production and distribution and this is expected to improve the profitability of existing sales.

As stated above, the most recent year in which the debtor was profitable was 1977. It lost $3,274,000 in 1979 and $3,690,000 in 1980. In 1981 the company lost $5,762,000. For the first seven months of 1982 the company has lost $2,050,000.[2] It has projected losses for the months of August and September, but anticipates a 1.114 million dollar profit for the final three months of 1982. If the above projections prove correct, the company will have a loss of approximately $1,383,000 for 1982.[3] The bottom line pre-tax loss figure is expected to be $2,075,000.

Since the filing of the chapter 11 petition, the monthly projections of sales and operating income have consistently proven too optimistic. Mr. Chevrier testified that the projected gross sales for May were $2,516,000 while actual gross sales were $2,312,000; the projected net sales were $2,049,000 while actual net sales were $1,880,000; the projected operating income was $130,000, while the actual loss was $299,000. For the month of June projected gross sales were $2,955,000 and actual gross sales were $2,902,000; projected net sales were $2,416,000 and actual net sales were $2,413,000; projected operating loss was $100,000 while the actual operating loss was $245,000.

The president testified that the substantial difference between actual and projected operating loss for the month of June was unusual in light of the relatively small difference between projected and actual sales. Generally he can attribute "misses" on the operating loss projection to errors in the sales projections. In June the sales projection error was small. The "miss" was

2. The debtor's president testified that this figure was taken from the "operating line" of the company's financial statement. Not included are professional fees incurred in connection with reorganization, interest on chapter 11 borrowing, and corporate general and administrative expense.

3. This $1,383,000 projected loss does not take into account any potential financial benefit from the new private label account or from the efforts of the food broker.

due to the combination of uncommon circumstances—down-time on a product line at the start of a major promotion plus adverse arbitration decisions which eliminated the use of part-time employees.

It has been stipulated between the trustee and Table Talk, for purposes of this hearing, that the pre-tax loss for the month of July will exceed $355,000, the ceiling established in the second stipulation re: the use of cash collateral dated June 25, 1982. The significance of the $355,000 figure arises from a provision in the June 25, 1982 stipulation that gives Greenstreet Properties, Inc.[4] ("Greenstreet") the right, should the debtor exceed the stipulated loss ceiling and not obtain an unsecured loan through the Karols in the amount of the excess, to withdraw its consent to the use of cash collateral and, after notice to the debtor and its counsel, file with the court the consent to adjudication presently in escrow and which is irrevocable until December 31, 1982. There was testimony that for the month of June the debtor was below the loss ceiling by approximately $20,000. The debtor's controller was questioned about four accounting entries which had been made that month which had the effect of decreasing losses in the approximate amount of $79,000.[5] The controller testified that these entries were in accordance with generally accepted accounting principles and there was no evidence to the contrary. Further, the controller testified that other adjustments were made on the June financial statement which had *unfavorable* effects on income.

The debtor is presently financing its operations through the use of cash collateral in which Greenstreet claims a security interest.[6] It is not, however, throwing off enough cash to finance its operations through the end of this calendar year. The controller, Thomas D. Karol, testified that additional financing[7] would be needed in September.

On two occasions since the filing of the chapter 11, the cash flow statements[8] submitted by the debtor to the office of the United States trustee showed cash deficiencies in the approximate amounts of $87,000 and $7,000, respectively. There was never, however, a negative balance in the debtor's bank account. This is because checks were issued at the end of the period, and therefore appeared as debits, but were not presented for payment until the following Monday which is the day on which the debtor collects a substantial amount of its receivables. In effect, the· debtor was "playing the float". The debtor has changed this practice and is now waiting until Monday to issue checks.

On one occasion checks were issued when there was at least some question about whether there would be funds available to cover them. On or about June 23, 1982 payroll checks were issued despite the fact that Greenstreet had, a day or two earlier, indicated that it was withdrawing its consent to the debtor's use of cash collateral.

---

4. See Footnote 6.

5. The four items were an adjustment to accrued real estate tax payable, an adjustment to record a retroactive rate adjustment for workmen's compensation insurance, a gain recorded on the sale of fixed assets (disposed of before the chapter 11 filing) and a decision not to increase the reserve for bad debts.

6. In the April 30, 1982 order approving stipulation re: cash collateral, the creditors' committee expressly reserved the right to challenge the secured status of Greenstreet Properties, Inc., the nominee of Squibb and Life Savers. On May 18, 1982 the committee filed a memorandum in which allegations were made as to certain financial transactions between Table Talk and its former owner Life Savers, a wholly owned subsidiary of Squibb. The committee alleges that these transactions were designed to get the owners' equity capital out of Table Talk or at least "bootstrapped" up to secured creditor status. A response to the memorandum was filed by Greenstreet Properties, Inc. on June 14, 1982.

7. By order dated April 30, 1982, the debtor-in-possession is authorized, pursuant to § 364(d), to incur secured debt up to $500,000 and, pursuant to § 364(b), to incur unsecured debt up to $500,000. The court is not informed as to the amount of debt actually incurred pursuant to the April 30 order.

8. Specifically, the statements for the periods April 25–May 8 and May 10–May 22.

Greenstreet had, in fact, instructed its agent, the First National Bank of Boston, to freeze the Table Talk account. The matter was brought to the court's attention on June 24, 1982 by way of the debtor's oral motion for an order directing Greenstreet to release the cash collateral. It is the debtor's position that Greenstreet had committed itself to funding the payroll irrespective of whether the use of cash collateral issue were resolved in the debtor's favor. The court ordered the release of an amount represented to be sufficient to cover the payroll checks and continued the hearing on the use of cash collateral to the next day. At that hearing the parties presented the second stipulation re: use of cash collateral which was approved by the court. Employees of Table Talk came to both the June 24 and June 25 hearings bearing placards supporting the position that the debtor be permitted to use cash collateral and that Table Talk continue in business. The debtor's controller testified that he was aware through the union's business agent that employees would be at the hearing, that management did not "orchestrate" the employees appearance, and that management did not have the authority to prevent the employees' attendance.

A committee of unsecured creditors was appointed by the United States trustee on April 19, 1982. That committee retained as counsel, with the approval of the court by order dated May 4, 1982, the law firm of Nutter, McClennen & Fish. On May 26, 1982 by order of the court, the accounting firm of Price Waterhouse was appointed to provide accounting services for the unsecured creditors committee. According to the controller, Price Waterhouse has been on site only once and the debtor regularly sends it financial documents.

Providing accounting services to the debtor since its acquisition by Texas General in December of 1980 is the firm of Main, Hurdman & Cranston. The firm was authorized to provide services to the debtor-in-possession by order of the court dated July 1, 1982. The firm prepares the annual audit, prepares the tax returns, and is consulted by the debtor on accounting and financial management questions. The firm does not supervise the preparation of the monthly operating statements.

The accounting firm of Finn, Hersey & Co. has been retained by Greenstreet Properties, Inc. The controller testified that an individual from that firm is on site one or two days per week. The firm's primary purpose, in the opinion of the controller, is to monitor the progress of the case with the interests of Greenstreet in mind. A firm known as N.P.M., a New York firm, is involved in the case on behalf of Squibb to investigate both accounting and managerial aspects of the business. According to the controller, N.P.M. is in the nature of a management consultant firm and its primary partner has owned food service companies for many years. An individual from that firm is on site weekly. In sum, then, there are three sets of accountants and one management consultant presently involved in this case.

The assistant United States trustee stated that the trustee's motion was supported by the unsecured creditors committee and by "the secured creditor". Counsel to the unsecured creditors committee filed a memorandum in support of the United States trustee's motion and presented oral argument at the hearing, but did not present evidence. Neither Squibb nor Greenstreet was represented at the hearing and neither has formally presented its position on the motion to the court.

### DISCUSSION

The appointment of an examiner is clearly one that is discretionary. *In re Lenihan,* 4 B.R. 209, 6 B.C.D. 368, 2 C.B. C.2d 72 (Bkrtcy.D.R.I.1980). The standards the court applies for the appointment of an examiner are the same as those applied for the appointment of a trustee, namely, that "the protection must be needed, and the costs and expenses must not be disproportionately high". H.R.Rep.No.95–595, 95th Cong., 1st Sess. (1977) 402, U.S.Code Cong. & Admin.News 1978, p. 5787, 6359. "[T]he application of § 1104(b) should be limited to

cases in which there is sufficient evidence to provide a factual basis for the granting of such relief." *In re 1243 20th Street, Inc.*, 6 B.R. 683, 6 B.C.D. 1190, 1191, 3 C.B.C.2d 71 (Bkrtcy.D.D.C.1980). There is no requirement that misconduct or incompetence be proved, but "there should at least be some evidence presented that [the] allegations have some factual basis". *In re Bel Air Associates*, 4 B.R. 168, 173, 6 B.C.D. 284, 287, 2 C.B.C.2d 103 (Bkrtcy.W.D.Ok.1980).

The theme of the trustee's argument for the appointment of an examiner is the lack of confidence creditors have in the debtor's financial information because of the debtor's consistent failure to meet its monthly projections of sales and operating income. This consistent failure to meet projections indicates to the trustee that the debtor's management is not taking a realistic view of its business situation. Also of concern to the trustee are the continuing operating losses and the occasions in May and June when the debtor issued checks when it was not clear that funds were available to cover the checks. The question for the court is whether these circumstances should compel the court, in the exercise of its sound discretion, to conclude that it is in the best interests of the parties in interest to authorize the appointment of an examiner.

I have attempted to set out very comprehensively in the first part of this opinion the evidence presented to me at the hearing on this motion. There is no question that the trustee has sufficiently supported his allegations that the debtor has consistently not met its projections. But that still leaves me with the question of what protection an examiner would provide.

It is obvious that what the trustee, and the creditors want an examiner to do, is to take an impartial look at the debtor's financial information and to make an impartial assessment as to the debtor's ability to effect a turn-around. However, the principal reason for the appointment of Price Waterhouse ("Price") to provide services to the creditors' committee was that the creditors' committee would not have to rely exclusively on the debtor's numbers. Apparently Price has only been on site once and has to date limited its services to review of the debtor's cash position. First, I must note that the application to appoint Price as accountant to the creditors' committee, which I approved on May 28, 1982, describes the professional services Price is to render as follows:

(a) to give the Committee financial and accounting advice with respect to this case;

(b) to assist it in its investigation of the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(c) to participate with it in the formulation of a plan; and

(d) to perform such other financial and accounting services as may be required and in the interest of the creditors.

It is not clear to me precisely what it is that the creditors' committee wants an examiner to ascertain that Price is not capable of doing. There was no evidence that the debtor has been uncooperative with Price. There was no evidence to suggest why Price and the debtor's financial personnel cannot sit down together and review the data and the assumptions that go into the debtor's projections, and why Price cannot then present to the creditors an impartial evaluation of the soundness of the projections.

Two other points should be made on the issue of the unreliability of the debtor's projections. First, the formulation of projections is not an easy job in the ordinary case. Here we have a business in which the business plan was at best unsettled for most of the past two years. The current management has established a business plan and this plan is for a business considerably different from the business that existed a year ago. A year ago there were 100 routes in New York and New Jersey which represented 15 million dollars of business, there were twice the number of thrift stores,

there was underway the distribution of outside purchase items which ultimately proved unsuccessful, and there were 130 distribution routes in New England as compared to 101 today. As a result, the debtor has no comparable history to look to in developing projections. Second, it can't be ignored that the debtor has a big stake in meeting its projections. Greenstreet is holding a consent to adjudication executed by the debtor which Greenstreet may file if losses exceed the projections and the debtor's principals do not make up for the excess by means of an unsecured loan.

Even if I should conclude that, despite the broad description of services for which Price has authorization, Price is not the appropriate vehicle for performing the kind of investigation the trustee seeks, it must still be shown that management's business decisions *require* investigation. The trustee admits in his brief that losses during the course of a chapter 11 proceeding, standing alone, do not indicate poor management practice. The conduct of present management which concerns the trustee and which arguably would fit within the category of "irregularity" is the June incident in which payroll checks were issued after Greenstreet had withdrawn its consent to the use of cash collateral. The parties debate whether this was done with or without notice to the debtor and the debtor further contends that Greenstreet had agreed to cover the payroll checks no matter what disposition was made of the application for use of cash collateral. Related to this incident is the appearance of placard-bearing employees at the two court hearings in which the cash collateral dispute was taken up. The trustee suggests that the debtor orchestrated the appearance of the employees with the intent of putting pressure on the court to view favorably its request to use cash collateral. The debtor denies the allegation. Even accepting, for the sake of discussion, the trustee's characterizations, I am hard-pressed to see what benefit would be rendered by an examiner's investigation of the. incidents or what duties the court would assign to the trustee as a result of those incidents. The June checks issue was the most serious allegation set forth by the trustee. In fact, the only other "irregularity" alleged by the trustee were the two May cash flow reports showing negative cash position. A reasonable explanation was provided by the debtor, the problem has not reoccurred, and, according to the controller, no check issued by the debtor-in-possession has been dishonored.

 Based on the evidence presented at the hearing regarding business decisions recommended by the first president which turned out, in retrospect, to have been disastrous, specifically the decision to eliminate the New York and New Jersey routes, I would conclude that the first management showed poor judgment rather than incompetence. A showing of imprudent business decisions on the debtor's part is not conclusive on the issue of the debtor's integrity or ability. *In re Eichorn*, 5 B.R. 755, 6 B.C.D. 995 (Bkrtcy.D.Mass.1980). The evidence presented on the present management leads the court to conclude that there is a competent individual in charge and that serious efforts are underway to improve the debtor's financial position. The new president appears well-qualified for his task. He has focused on the chief business problems in the debtor's life, and has taken concrete steps to address them. In addition to the expertise the new president brings to the case, the management consultant hired by Squibb, whose professional background is in this industry, is also available. Then there are the three accounting firms, each representing a different interest, in place in the case to examine the numbers. Again, I must say, I am unable to identify what meaningful contribution an examiner could make to the case at this time. While I have given serious consideration to the view taken by the trustee, the creditors' committee, and the secured creditor, I cannot see how it is in the best interests of creditors to place another functionary in this case when no one has satisfactorily explained what an examiner could do that present functionaries could not do. The legislative history clearly states the standard: the protection must be needed and the costs must not be

disproportionately high. In a situation like this one where no convincing showing of need has been made and the debtor is just about to emerge from what historically are its slowest months for pie sales, this additional administrative expense, which is certain to be substantial, would be "disproportionately high".

I am not overlooking the oral argument of counsel to the creditors' committee that the creditors need an impartial assessment of the viability of this debtor so that they individually can make appropriate business decisions in their own business affairs. This is the problem faced by creditors dealing with any chapter 11 debtor. If it constituted grounds for the appointment of an examiner, we would have an examiner in every chapter 11 case. Obviously the ripple-effect caused by the changing fortunes of a business the size of Table Talk, Inc. is more substantial than that in the majority of chapter 11 cases. But in this case we have the countervailing fact that the debtor is now moving into the months which have traditionally been profitable for it and presumably, therefore, for its suppliers.

There were several allegations set out in the memorandum filed by the creditors' committee which I have not addressed. Allegations for which no evidence was adduced at the hearing were for that reason not considered by the court in ruling on this motion. Because I limited evidence on the circumstances surrounding the 1980 transfer in ownership of the debtor, that issue is not precluded from consideration at another time.

For the reasons stated above I conclude that there is not sufficient evidence that it would be in the best interests of creditors and the other interests of the estate to authorize the appointment of an examiner. Therefore, it is ORDERED that the motion of the United States trustee for the appointment of an examiner is hereby DENIED without prejudice to the United States trustee or any other party-in-interest to renew the motion on the basis of evidence not before the court and not considered at the hearing of August 4, 1982.