**In re GHR ENERGY CORP., Debtor.**

**Bankruptcy No. 4–83–0056–G.**

United States Bankruptcy Court,
D. Massachusetts.

Sept. 13, 1984.

---

Stephen Gordon, McCabe/Gordon, Boston, Mass., for debtor, Good Hope Energy Corp.

Robert M. Gargill, Choate, Hall & Stewart, Boston, Mass., for Continental Illinois National Bank & Trust Co. of Chicago agent for debtors' secured bank creditors.

Sumner Darman, Silverman & Kudisch, Boston, Mass., for Creditors' Committee The GHR Companies.

Joseph Braunstein, Riemer & Braunstein, Boston, Mass., for Creditors Committee GHR Energy.

Van Oliver, Arkin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for Creditors Committee GHR Pipeline Corp., Southern States, Inc., So. States Exploration, Inc.

Stanley Epstein, Epstein, King & Isselbacher, Boston, Mass., for GATX.

## MEMORANDUM AND ORDER

PAUL W. GLENNON, Bankruptcy Judge.

On November 2, 1983, the Court issued a Memorandum and Order ("Memorandum") dismissing (without prejudice) the application of GATX Terminals Corp. ("GATX") seeking an order setting a date by which the debtor, GHR Energy Corp. ("GHR" or "debtor"), must either assume or reject certain leases ("leases"), pursuant to 11 U.S.C. § 365(d)(2) and requiring that the debtor pay $1,072,000 to GATX as a condition thereto. Left for the Court's determination was the resolution of the use and occupancy charges owed by the debtor to GATX during the period the debtor explored and evaluated the options available to it as respects the leases. The basic dispute is whether the use and occupancy charge should be calculated by applying the total number of barrels of shell *capacity* (GATX) or by applying the number of barrels of product *actually in storage* (GHR). One other matter, which has been under advisement, is the Application of GATX for Leave to Utilize Certain Petroleum Tank Storage Warehousing Facilities ("Application"). These matters will be taken up separately below. Most of the relevant facts are set forth in the Memorandum and will not be repeated herein, except where necessary. A copy of the Memorandum, is however, appended hereto for the convenience of counsel and to the extent applicable, the findings of facts are incorporated herein.

### 1. Use and Occupancy Charges

■ As set forth in the Memorandum (in greater detail) a Chapter 11 debtor, unlike a Chapter 7 debtor, is afforded a reasonable time within which to elect whether to assume or reject an executory contract or unexpired lease. *Compare* § 365(d)(1) *with* § 365(d)(2). *See also, e.g., Theatre Holding Corp. v. Mauro*, 681 F.2d 102 (2d Cir.1982). While a court may not

order a debtor to either assume or reject an unexpired lease, *see, e.g., In re Will*, 33 B.R. 843 (Bankr.M.D.Fla.1983), pursuant to § 365(d)(2), a court, in its discretion, *see, e.g., In re Braniff Airways, Inc.*, 26 B.R. 628 (N.D.Tex.1982), may fix a date for assumption or rejection of leases upon the expiration of a reasonable time. In fixing this date, a court must review the particular circumstances before it. *In re Lionel Corp.*, 23 B.R. 224 (Bankr.S.D.N.Y.1982) and *In re New England Carpet Co.*, 18 B.R. 514 (Bankr.D.Vt.1982). During the time the debtor is exercising its freedom to forestall making an election and is exploring the options available to it, it must compensate the lessor for using and occupying the leased premises. *See, e.g., In re Attorneys Office Management, Inc.*, 29 B.R. 96 (Bankr.C.D.Cal.1983).

■ As of this date, GHR has neither assumed nor rejected the leases in question (and has made only minimal payments, for variable charges, to GATX). Consequently, GHR remains liable for "the reasonable value of the use and occupancy of the premises". 2 Collier on Bankruptcy ¶ 365.-03 at 365–24 (15th ed. 1984); *see also Philadelphia Co. v. Dipple*, 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651 (1941); *Palmer v. Palmer*, 104 F.2d 161 (2d Cir.), *cert. denied*, 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939); *In re Fred Sanders Co.*, 22 B.R. 902 (Bankr.E.D.Mich.1982); *In re Rhymes, Inc.*, 14 B.R. 807 (Bankr.D.Conn. 1981); and *In re Midtown Skating Corp.*, 3 B.R. 194 (Bankr.S.D.N.Y.1980). "As long as the debtor continues to receive benefits under [the] contract it must also bear the burdens or obligations imposed under the contract." *In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 435 (Bankr.S.D. N.Y.1982), *aff'd*, 34 B.R. 385 (S.D.N.Y. 1983).

What is "the reasonable value of the use and occupancy of the premises" is subject to conflicting opinions. Courts which have addressed this question have not been in agreement as to whether a lessor's claim is based on the reasonable value of the property regardless of the use made of the

property by the debtor or whether it is based solely on the value of the debtor's actual use of the property. The recent case of *In re Fred Sanders Co., supra* contains perhaps the most cohesive compilation and discussion of cases in this area.[1] The facts of that case are enviously simple and are as follows: The debtor leased three vans from the creditor at a monthly rental of $966.18. After the debtor filed its Chapter 11 petition, the creditor filed an application requesting the court to set a date by which the debtor must assume or reject the lease. The debtor, creditor and creditors' committee agreed upon such a date, following the expiration of which, the debtor returned the vans to the creditor. This was approximately one year after the Chapter 11 petition was filed during which time the debtor made only "a" payment. The creditor then sought an administrative expense priority for its claim pursuant to 11 U.S.C. § 503(b)(1)(A). The debtor objected to the allowance of the claim on the grounds that the creditor had no claim since the debtor did not use the vans prior to rejecting the lease. The court held: "[T]he lessor's claim should be based on the reasonable value of the property regardless of the purpose for which it was used by the debtor." *Id.* at 906. "The lessor has a right to assume that until a debtor rejects a lease, the leased property is being used for the purpose for which it was leased and that the debtor will pay the reasonable value of the property measured by such use." *Id.*

at 907. The Court rejected those cases which hold that the debtor is liable only for the actual use made of the property[2] and chose instead to follow those cases which hold that the lessor's claim is measured by the reasonable value of the leased property.[3] The court recognized that minimizing administrative expenses is desirable but felt more strongly that claimants having valid charges against the estate should not be penalized because of thoughts of economy. "To permit a debtor to deprive a lessor of the use of his property and unilaterally dictate the amount of the lessor's claim does not comport with elementary notions of justice." *Id.* at 906. Furthermore, the court found that the debtor's obligation to pay the reasonable use value of the property is tempered by the debtor's § 365 rights which allow a debtor to assume or reject a lease and to assign a lease, even if the lease contains an anti-assignment clause. Finally, the court noted that by acting timely, a debtor would be in the position to control administrative expenses. " '[T]he debtor is generally well aware in advance that a bankruptcy may be necessary and can plan ahead to decide which leases should be retained.' " *In re Fred Sanders Co., supra,* at 907 *(quoting* S.Rep. No. 527, 97th Cong. 2d Sess. 12 (1982)).

The Court finds the reasoning of *In re Fred Sanders Co., supra,* to be persuasive and accordingly chooses to follow that case

---

1. While the introductory sentence appears to limit the holding of this case *(i.e.:* "This controversy involves the question of how to compute an administrative claim for leased property when the lease is ultimately rejected by the debtor") as I recognized in my Memorandum, if the debtor rejects the leases, it remains liable for unpaid use and occupancy charges as an expense of administration. *See also Collier, supra* at 365–25.

2. *See, e.g., In re American Anthracite & Bituminous Coal Corp.,* 280 F.2d 119 (2d Cir.1960); *In re United Cigar Stores Co.,* 69 F.2d 513 (2d Cir.1934); *In re North Atlantic and Gulf Steamship Co.,* 166 F.Supp. 29 (S.D.N.Y.1958), *aff'd sub nom. 120 Wall Associates v. Schilling,* 266 F.2d 548 (2d Cir.1959); and *In re Rhymes, Inc.,*

supra; *see also In re Braniff Airways, Inc., supra; In re Peninsula Gunite, Inc.,* 24 B.R. 593 (Bankr. 9th Cir.1982); *In re Cardinal Export Corp.,* 30 B.R. 682 (Bankr.E.D.N.Y.1983); and *In re Theatre Holding Corp.,* 22 B.R. 884 (Bankr.S.D.N.Y. 1982).

3. *See, e.g., Kneeland v. American Loan & Trust Co.,* 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379 (1890); *Diversified Services, Inc. v. Harralson,* 369 F.2d 93 (5th Cir.1966); *In re Millard's, Inc.,* 41 F.2d 498 (7th Cir.1930); *Fleming v. Noble,* 250 F. 733 (1st Cir.1918); *Dayton Hydraulic Co. v. Felsenthall,* 116 F. 961 (6th Cir.1902); and *In re Florida Airlines, Inc.,* 17 B.R. 683 (Bankr.M.D. Fla.1982); *see also In re Nathanson,* 24 F.2d 760 (D.Mass.1927) and *In re Royal International Corp.,* 30 B.R. 750 (Bankr.W.D.Ky.1983).

and those relied upon by the *Sanders*[4] court. GATX moved promptly for an order setting the date within which GHR must assume or reject the leases. The debtor contested GATX's application. While it became known, at least as early as the hearings on the use and occupancy question, that the debtor was only storing approximately three quarters to one and one quarter million barrels of petroleum products in the tanks and that this number was decreasing, the debtor was unwilling to reject the leases. GATX was never given orders by GHR to clean the residue out of any tanks. GHR did not show that it was possible to "share" the tanks with others. GATX was accordingly unable to relet the storage tanks to third parties. Contrary to GHR's assertions, GATX does not have to prove that there are available third parties who wish to rent the tanks nor is evidence of excess available tankage, alone, relevant. The interconnecting pipes among the storage tanks need to be dismantled before a tank can be relet to a third party, and the tanks themselves need to be cleaned, all at a hefty price. By refusing to elect whether to assume or reject the leases, the debtor effectively controls each tank covered by the leases no matter how many barrels of the debtor's product are actually stored therein, and the debtor should be charged for the number of barrels of shell capacity. This is not a case where the lessee has relinquished total control over an identifiable and individually usable portion of leased property.

The full shell capacity is approximately 4.5 million barrels. As the Court noted in the Memorandum, both GHR's and GATX's expert witnesses testified, that 15¢ per barrel is a reasonable rate for the storage of oil.[5] This is very close to the contract rate. To the extent that some tanks have been returned to the control of GATX, the debtor will not be charged for them. The Court finds that 15¢ per barrel is a reasonable charge and that this should be multiplied by the total number of barrels of shell capacity up to the date debtor rejects the leases to arrive at the proper use and occupancy charges.[6] The Court also finds that the debtor has failed to rebut the presumption that the contract rate for the other fixed charges, *i.e.*, land rent, fresh water fee and water treatment fees, is reasonable. The contract rate is presumed reasonable and is to be so taken unless the debtor introduces convincing contradictory evidence. *See, e.g., S & W Holding Co. v. Kuriansky*, 317 F.2d 666 (2d Cir.1963); *In re North Atlantic and Gulf Steamship Co., supra;* and *In re Chase Commissary Corp.*, 11 F.Supp. 288 (S.D.N.Y.1935); *see also* 3A Collier on Bankruptcy ¶ 62.14 at 1516 (14th ed. 1975). Accordingly, the debtor is liable for these fixed charges as per the contract.

While the debtor may argue that this is a particularly harsh result,[7] the Court notes that the debtor had it within its control to reject the leases entered into with GATX and to attempt to enter into new leases for a smaller number of tanks. Furthermore, the cash collateral orders entered by this Court invariably contained a line item budget for GATX payments. Little if any

---

4. In fact, this Court has just recently accepted that holding as controlling in the case of *In re Table Talk Inc.*, 22 B.R. 706 (Bkrtcy.1982). *See* Memorandum and Order of May 4, 1984.

5. The terms of the warehousing agreement and the land lease provided for monthly fixed rent and fees in the total amount of $708,407.92 which amount increased to $739,300.81 effective March 1, 1983. The increase is attributable to increased labor costs incurred by GATX and passed on to GHR, pursuant to the leases. This includes land rent, a fresh water fee, and water treatment fees. Presumably there was also an increase effective March 1, 1984.

6. If the debtor assumes the leases, as set forth in the Memorandum, the debtor must satisfy 11 U.S.C. § 365(b)(1), *i.e.*, cure the default or provide adequate assurance of prompt cure, compensate GATX for actual pecuniary loss resulting from the defaults, and provide adequate assurance of future performance under the leases.

7. The debtor introduced testimony that the fair value of the inventory stored in GATX tanks is approximately $15,000,000.

of which amounts budgeted, according to GATX, were ever paid to GATX.[8]

■ The Court now reaches the question of the proper amount owing for the variable charges. Counsel for GATX described the difference between the fixed and variable charges as follows: The fixed charges are "determined in accordance with the land lease and the warehousing agreement .... [T]he variable charges are ... charges incurred by the debtor for services that it requires and requests from GATX ... in connection with the movement of its products in and out of the terminal facility and its refinery". Transcript of March 28, 1983 hearing at 5–6. Examples of variable charges include loading charges, utility charges, and charges for pumping services. At the time of the hearing, GATX introduced invoices for the variable charges incurred during the months of January (only five days of which were post-petition days) February, and March 1983. The figures ranged from $21,640.45 to $415,569.51. The debtor failed to introduce evidence that the contract rate for the variable charges was unreasonable, as was the debtor's burden. *See*, cases cited *supra*, p. 672. Therefore, the variable charges are to be determined in accordance with the formula set forth in the leases.

However, as the Court is not now exercising jurisdiction over this and its affiliated debtors, the Court is not in a position to determine a workable payment schedule. "The determination of when an administration expense is to be paid is within the discretion of the trial court." *In re Verco Industries*, 20 B.R. 664, 665 (Bankr. 9th Cir.1982). The Court is leaving this matter for resolution to the bankruptcy court in Houston. The Court has considered its function herein to be akin to a state court: liquidating a claim yet deferring the question of payment to the wisdom of the court overseeing the bankruptcy case.

## 2. GATX's Application

The debtor mentioned several times during the use and occupancy hearings that it wished to consolidate its products stored in GATX tanks so that it could return some of the tanks to GATX. However, it alleged it was having problems reaching an accord with GATX on the specifics. One witness testified that GHR hoped to consolidate to less than 200,000 barrels of shell capacity. GATX has vigorously argued that the debtor must return all of the tanks if it wishes to return any of them, relying on the rule that a contract may not be assumed in part and rejected in part, and must be assumed *cum onere. See, e.g., Thompson v. Texas Mexican Railway Co.*, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946); *In re Silver*, 26 B.R. 526 (Bankr.E.D.Pa.1983); *In re City Stores Co.*, 21 B.R. 809 (Bankr.S.D. N.Y.1982) and cases cited therein.

In an effort to get some return on its tanks while waiting for GHR to make its election, GATX by its Application, now seeks to have available to it for possible rental to third parties, some of the tanks which are covered by the leases.[9] While the Application is not styled as such, the Court, applying its inherent powers of equity, is treating it as one requesting the Court to set a time within which the debtor must assume or reject the leases. *Cf. In re Chase Commissary Corp., supra* and *In re Easthampton Sand & Gravel Co.*, 25 B.R. 193 (Bankr.E.D.N.Y.1982). It is now clear that both parties are "playing both sides of the fence" yet hoping for similar results. GATX wants to relet *some* of the tanks although it argues that GHR must relinquish *all* of the tanks if it wishes to relinquish any. GHR objects to the application of GATX to relet *some* tanks although it seeks to consolidate its products into *less than all* of the tanks it leases from GATX. GHR has neither assumed nor rejected the leases and has given no

---

8. The court makes no finding as to whether the amounts budgeted were in fact the true amounts owing to GATX.

9. The proposed form of order submitted by GATX has the assent of the debtors' secured bank lenders and the three official creditors' committees active in this and the other related bankruptcy proceedings.

indication of a time frame within which it intends to do same. The Court believes it would be in the interests of both parties, and generally all other creditors, for GHR to strike a new deal which would provide for the leasing of only those tanks which GHR reasonably needs. Possibly, this might include an option for future expansion. This could be accomplished if GHR rejected the present leases with GATX. While the Court is not in the position to force GHR to reject the leases, *see In re Will, supra,* it may set a time within which GHR must make its election. GHR may not keep GATX waiting, forever. The time for making an election is now drawing near.

Although the Court has transferred the case to the bankruptcy court for the Southern District of Texas, during the final months during which this Court oversaw the reorganization of this debtor and its affiliates, it became clear to the Court that the disposition of the refinery would not play as large a role in the reorganization proceedings as the Court and the parties previously envisioned. Payment to GHR's creditors is most likely to be made from the production proceeds of the debtor's large oil and gas holdings. During the time the venue of this case was in Massachusetts, there was little movement towards any form of disposition of the refinery. The Court recollects the debtor's seeking to hire an investment banker to aid in the refinery's disposition (which was granted), certain related matters which sought funding for converting the visebreaker to a delayed coker, and several statements of counsel describing the refinery as a wasting and draining asset. While I recognize as true today what I stated in the Memorandum concerning the ease with which the refinery may be disposed and the possibility of adverse tax consequences upon an improper disposition, the Court now believes the debtor should be in the position to make its determination as to whether it needs these leases as a condition for disposing of the refinery. The debtor has had a consultant on line for approximately six months and this case has been pending for

approximately twenty months. The size of the case, by itself, is no longer justification for neglecting all creditors. Accordingly, the debtor shall have forty five (45) days to make its election. *See In re Lionel Corp., supra.* This holding renders a determination of the application of GATX unnecessary.

SO ORDERED.

## APPENDIX

### MEMORANDUM AND ORDER

A creditor-lessor, GATX Terminals Corp. ("GATX"), has applied to the Court pursuant to 11 U.S.C. § 365(d)(2) for an order setting a date by which the debtor must either assume or reject certain leases. Opposing the application, in addition to the debtor, are the creditors' committee of GHR Energy Corp., the creditors' committee of The GHR Companies (the parent corporation), and Continental Illinois National Bank and Trust Company of Chicago as agent for the debtor's secured bank creditors. For the reasons set forth herein, I am dismissing the application without prejudice.

### BACKGROUND

This Chapter 11 case was commenced by the filing of a voluntary petition under Chapter 11 on January 26, 1983. The debtor has continued in operation of its business as debtor in possession pursuant to 11 U.S.C. § 1107(a) and § 1108. GHR Energy Corp. ("GHR") is a Texas corporation and the successor in interest to Good Hope Refineries, Inc. ("Good Hope"). GATX is a Delaware corporation and the successor in interest to General American Transportation Corporation ("General").

On August 29, 1973 General, as lessor, and Good Hope, as lessee, entered into a warehousing agreement for the lease of bulk petroleum storage tanks located at Good Hope, Louisiana. The warehousing agreement has been periodically amended so that as of the date of the commencement of this Chapter 11 case, and at present,

GATX leases to GHR about 44 tanks having a capacity of approximately 4.5 million barrels. The lease expires on October 31, 1989 but may be renewed for three additional five-year periods.

On August 29, 1973 General and Good Hope also entered into a land lease for six parcels of real estate adjoining the tank terminal storage facilities. These parcels consist of approximately 45 acres and are improved with oil refinery facilities owned by GHR. The initial term of the land lease terminates on October 31, 1989. The lessee may renew the land lease for three additional five year periods. The land lease and warehousing agreement were assumed in the Chapter XI case filed by Good Hope in 1975.

As of the date of filing, the terms of the warehousing agreement and the land lease provided for monthly fixed rent and fixed fees in the total amount of $708,407.92. This figure included $8,024.15 for land rent, $639,307.39 for tank storage rentals, an $8000 fresh water fee,[1] and $15,609.38 in water treatment fees.[2] The fixed rent and fees increased to $739,300.81 effective March 1. These fee increases stem from a provision in the warehousing agreement which permits a fixed percentage of the increases in labor costs incurred by the lessor to be passed on to the lessee.

The agreements also provide for variable charges which are charges incurred by the debtor for services that it requires from GATX in connection with the movement of its products in and out of the terminal facility and its refinery. Items included within the variable charges are utilities, in/out commodities handling; labor, steam, circulation; natural gas; engineering services; and loading charges.

As of the Chapter 11 filing the debtor owed GATX approximately 14.5 million dollars in unpaid fixed and variable charges. This pre-petition debt, according to GATX, is secured by a lien on inventory and the proceeds of that inventory. The orders authorizing and restricting the use of cash collateral protect GATX's security for its pre-petition debt. Subsequent to the Chapter 11 filing, the debtor has made no payments on account of fixed rental charges and has made relatively unsubstantial payments on account of variable charges when necessary to permit movement of product. On March 14, 1983 the debtor was ordered to pay $450,000[3] on account of use and occupation until the evidentiary hearing to establish appropriate use and occupation charges could be held and findings made.[4] Two days of hearings have been held but the Court has not yet made findings and entered an order. The debtor has not made the $450,000 payment. The post-petition arrearage to date, based on the rates under the leases, is approximately 7 million dollars. The budgets which are part of the cash collateral order entered twice a month by the Court show that a total of $3,881,000 has been budgeted by GHR for payments to GATX through October 31, 1983. The debtor, however, has not made any payments except those for movement of product as noted above.

The debtor has until November 22, 1983 the exclusive right to file a plan.[5] Counsel to the creditors' committee has been reporting in open court that the creditors' committee and the debtor are making progress toward agreement on the key terms for a

---

1. One tank stores fresh water necessary for fire-fighting purposes.

2. This is a charge for the treatment of water before it can be discharged into Lake Pontchartrain through various bayous. This treatment is required pursuant to certain environmental regulations.

3. The debtor's appeal of this order was dismissed by United States District Court Judge Frank Freedman on June 1, 1983.

4. Until assumption or rejection of the lease, the estate is liable only for the reasonable value of the use and occupancy of the premises. *Palmer v. Palmer*, 104 F.2d 161 (2nd Cir.), *cert. den.*, 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939).

5. The debtor has been granted two extensions.

plan of reorganization. Since the very first hearing after the Chapter 11 filing, the debtor, the creditors' committee, and the bank group have stated that the key to the reorganization would be the disposition of the refinery. The refinery, which sits on the land leased to the debtor by GATX, has not operated since the filing of the Chapter 11.[6] It is a cash flow drain at the rate of 1.9 million dollars per month. The debtor's investment in the refinery is 900 million dollars. The adjacent tankage facilities are an integral part of the refinery operation. The bank group has hired experts to evaluate various options for disposition of the refinery, e.g., sale, lease to a third party, or a processing agreement with a third party. According to counsel to the creditors' committee of The GHR Companies, an inappropriate disposition of the refinery would trigger a 265 million dollar liability to the purchasers of the debtor's investment tax credits.[7]

### DISCUSSION

11 U.S.C. § 365(d)(2)[8] puts a request for a date by which the debtor must assume or reject the lease within the discretion of the Court. *In re Braniff,* 26 B.R. 628, 636 (D.C.N.D.Tex.1982). The debtor in possession is allowed a reasonable time to decide whether to assume or reject. *Theatre Holding Corp. v. Mauro,* 681 F.2d 102, 105 (2nd Cir.1982). What constitutes a reasonable time depends on the circumstances of the particular case. *Id. See also In re New England Carpet Co.,* 18 B.R. 514 (Bankr.D.Vt.1982). Factors to be considered are "the nature of the interests at stake, the balance of the hurt to the litigants, the good to be achieved, the safeguards afforded those litigants, and whether the action to be taken is so in derogation

of Congress' scheme that the court may be said to be arbitrary." *In re Midtown Skating Corp.,* 3 B.R. 194, 198 (Bankr.S.D. N.Y.1980). The complexity of the case is also a factor in determining what is reasonable. *In re Braniff, supra,* and *In re Gulfco Investment Corp.,* 520 F.2d. 741, 743 (10th Cir.1975).

All parties agree that the key to the reorganization is the disposition of the refinery which, even when not in operation, is a substantial cash flow drain on the debtor's operations. The disposition of an oil refinery is a significantly more complex task than the disposition of a retail store or an office building. The fourteen member bank group, Continental National Bank and Trust Company of Chicago, as agent, has found it necessary to retain specialists to evaluate the options. Even outside the Chapter 11 context, the disposition of the refinery could not be accomplished quickly because of the volatile economics of the industry, the possibility of involvement of a foreign government, the complex regulatory scheme, and the substantial tax considerations.

Whatever option for disposing of the refinery is chosen, the leases will be an essential part of the deal. In the opinion of Lewis A. Rockwood, an expert witness for GATX at the hearings to determine the appropriate use and occupancy charge, it is not possible to operate the refinery without the tankage that is committed under the warehousing agreement. (Transcript of April 20, 1983 at p. 148). GATX is in a powerful bargaining position. Any disposition of the refinery—short of abandoning it—will require an agreement with GATX or will require an assumption of the leases by the debtor. Assumption requires curing the default or providing adequate assur-

---

**6.** The debtor is also the principal operating company for the production and transmission of natural gas operations which it and related corporations conduct.

**7.** October 28, 1983 hearing on the debtor's continued use of cash collateral and objection of GATX thereto.

**8.** 11 U.S.C. § 365(d)(2) provides:

In a case under chapter 9, 11, or 13 of this title, the trustee [debtor in possession] may assume or reject an executory contract or unexpired lease of the debtor at any time before the confirmation of a plan, but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

ance of prompt cure, compensating GATX for actual precuniary loss resulting from the defaults, and providing adequate assurance of future performance under the leases. 11 U.S.C. § 365(b)(1). Even if the debtor were ultimately to reject the leases, the pre-petition arrearage is secured according to GATX and any unpaid post-filing amounts due in the nature of use and occupation charges would be a priority expense of administration.

Requiring the debtor to assume or reject on a date certain in the near future would be substantially prejudicial to the other creditors. Assumption would mean the incurrence of an enormous administrative expense before there is a firm deal for the disposition of the refinery. The debtor's only other alternative, rejection of the leases, would mean the debtor would be walking away from a $900 million dollar investment in an asset which might otherwise have, through careful disposition, improved for the benefit of all creditors the debtor's ability to pay its creditors. The court "must take into consideration the purpose of Chapter XI proceedings. The obvious impact of said Chapter is to provide for an arrangement whereby a company has an opportunity to rehabilitate its business operations and become a profit making concern in spite of its financial difficulties." *In re Blazon Flexible Flyer, Inc.*, 407 F.Supp. 861, 864 (N.D.Ohio 1976). The purpose of old Chapter XI and Chapter X, have been reaffirmed in the new Chapter 11 of the Bankruptcy Reform Act of 1978. *Theatre Holding Corp., supra*, at 106. I must conclude that this purpose would not be furthered by requiring the debtor at this stage of its reorganization to make a decision that will limit its options for disposing of the refinery, when not having maximum freedom in fashioning a plan for the disposition of the refinery will very possibly result in a dollar loss to all creditors, when GATX's exposure to risk is minimal, when it is plain that the decision is a complex matter, and when the debtor is making

progress toward formulation of its plan of reorganization.

However, a fair price must be paid for the freedom to forestall the decision to assume or reject the leases. *Id.* at 105. That price is reasonable payment for the use and occupation of the leased premises while the debtor explores and evaluates the options available to it. Both the debtor's and GATX's expert witnesses testified, at the use and occupation hearings, that 15¢ per barrel is a reasonable rate for the storage of oil. The dispute, in part, is over whether the rate of 15¢ per barrel should be multiplied by the total number of barrels of shell *capacity* (GATX) or by the number of barrels of product *actually in storage* (GHR). If the Court were to accept the debtor's approach, and, further, were to adopt the debtor's statement of the number of barrels stored by GHR for each of the months of February, March, and April, and further were to assume that this storage is static, the debtor should have paid $180,000, $150,000 and $112,000 respectively as a reasonable charge for storage during these months. (Debtor's Proposed Findings of Fact and Law Regarding Use and Occupancy Charges Owed to GATX, at paragraph 15.). Assuming that the number of barrels actually stored has averaged 700,000 [9] during the months from May to the present, the use and occupancy charge, again using the debtor's approach, would be $105,000 for each of these months.

The above-stated figures total $1,072,000. These figures do not make any provision for the ground rent, fresh water fees, water treatment fees, variable charges, or for the post-filing period in January and thus are very conservative. I wish to make clear that this approach to calculating a payment figure is temporary only and shall not bind the Court in any manner in the preparation of its findings and order in the separate proceeding to establish use and occupancy charges.

---

**9.** This figure was used by debtor's counsel in the course of his response to GATX's objection to

the continued use of cash collateral.

Therefore, it is ORDERED that the debtor, as a condition for maintaining its freedom to assume or reject the subject leases, is to make a payment of $622,000 in addition to the payment of $450,000 previously ordered, (for a total of $1,072,000) to GATX within seven (7) days of the date of this order. I have reviewed the cash collateral order, as most recently amended, and conclude that nothing therein conflicts with today's order.

The application to set a date by which the debtor must assume or reject the subject leases is DISMISSED without prejudice.

At Worcester, this 2 day of November, 1983.

/s/Paul W. Glennon
PAUL W. GLENNON
U.S. BANKRUPTCY JUDGE