### In re THATCHER GLASS CORPORATION, Debtor.

### PEOPLES GAS SYSTEM, INC., Movant,

v.

### THATCHER GLASS CORPORATION, Respondent.

Bankruptcy No. 5–84–00911.
Motion No. 5–85–0232–M.

United States Bankruptcy Court, D. Connecticut.

April 15, 1986.

Paul K. Barenholtz, Kelley, Drye & Warren, Stamford, Conn., for Peoples Gas System, Inc.

Barbara G. Kaplan, Stroock & Stroock & Lavan, New York City, for debtor.

### MEMORANDUM AND ORDER

ALAN H.W. SHIFF, Bankruptcy Judge.

People's Gas System, Inc. ("PGS") seeks relief from the automatic stay, 11 U.S.C. § 362(a), so that it may apply a security deposit it holds to pay for post petition natural gas it supplied to the debtor, Thatcher Glass Corporation ("Thatcher"). Thatcher in turn seeks an order directing PGS to return the security deposit together with interest thereon after deducting the amount of unpaid post petition charges for that natural gas.

### BACKGROUND

The parties have requested that the court enter judgment upon their pleadings, briefs, and the following stipulation:

1. On or about October 1, 1982 PGS and the Debtor entered into a one year "Contract for Interruptible Natural Gas Service" (the "Contract"), automatically renewable annually, under which PGS supplied natural gas to the Debtor's Tampa, Florida glass factory. (Exhibit A).

2. PGS is authorized by the Florida Public Service Commission to offer a reduced "interruptible service" rate ("IS

rate") for gas as contained in its IS rate tariff, only under contracts conforming with the requirements contained in PGS's IS rate tariff (Exhibit B), including the customer's agreement to maintain an alternative standby fuel source, to be subject to interruptibility and to take or pay for certain monthly and annual minimum quantities of gas.

3. As authorized by the Florida Public Service Commission, PGS supplies gas under the General Service Commercial and Industrial rate ("GSCI rate") tariff (Exhibit C) to commercial and industrial customers who have not signed a contract conforming with the lower IS rate tariff.

4. The current term of the Contract was for the year ending September 30, 1985.

5. On December 29, 1984 the Debtor filed a voluntary petition for reorganization under Chapter (sic) 11 U.S.C. § 101 *et seq.*

6. On February 14, 1985, in accordance with 11 U.S.C. § 366, this Court entered an Order on Stipulation, whereby the debtor was to pay to PGS the sum of $60,000 on Friday of each week for estimated gas service during the preceding week, to be credited monthly against the actual gas usage reading.

7. The Order on Stipulation further provided that the debtor pay to PGS a gas deposit of $200,000, which deposit was paid by the Debtor to PGS and, with interest, now stands in excess of $210,500.

8. Payments were made by the Debtor to PGS in accordance with the Order on Stipulation under the IS rate in existence under the Contract.

9. Full $60,000 weekly payments under the Order on Stipulation were made by the Debtor through March 8, 1985.

10. A partial weekly payment of $12,640.95 was made on March 19, 1985.

11. The total payments by the Debtor to PGS through March 19, 1985 in respect of post-petition gas service were $612,640.95.

12. In mid-March the debtor sharply reduced its gas consumption at its Tampa factory and, contemporaneous therewith, ceased production at the Tampa factory.

13. PGS continued to supply reduced quantities of gas to the Debtor from approximately mid-March to mid-May, 1985, without any additional payments from the Debtor.

14. The total amount of natural gas actually supplied by PGS and used by the Debtor post-petition was 1,498,622.5 therms.

15. On June 20, 1985 this Court entered an Order directing the Debtor to assume in accordance with 11 U.S.C. § 365(b) or to reject by July 15, 1985 the Contract; upon the Debtor's failure to act on or before July 15, the PGS Contract would be deemed rejected by the Debtor.

16. On July 1, 1985, the Debtor sold the bulk of its property, including all furnaces and other fixtures (but excluding the Tampa factory realty and buildings), to Diamond Thatcher, Inc., a newly-created subsidiary of Diamond-Bathurst, Inc.

17. The Debtor, by letter of counsel dated July 15, 1985, notified the Court and PGS that the Contract was deemed rejected (Exhibit D).

18. Upon consent of the parties, PGS has taken a final meter reading and retrieved its gas meter from the Tampa factory property.

19. Thatcher claims the price for actual post-petition gas usage at the IS rate is $626,792.59. Thatcher has paid $612,640.95, leaving a balance of $14,151.64.

20. PGS claims the price for actual post-petition gas usage at the GSCI rate is $800,568.60. Thatcher has paid $612,640.95, leaving a balance of $187,927.65.

Thatcher concedes that "[T]here is NO DISPUTE that the utility is entitled to an administrative expense claim for the 1,498,622.5 thermal units of natural gas con-

sumed after the filing date".[1] Accordingly, the narrow issue which will be addressed in this decision is what is the appropriate rate for calculating the administrative expense of those thermal units.

## DISCUSSION

Under Code § 503(a), an entity which provides goods or services to an estate in a voluntary bankruptcy case may file a request for payment of that administrative expense. Under Code § 503(b)(1)(A), after notice and a hearing, the reasonable value of the actual and necessary costs and expenses of such goods and services, which were necessary for the preservation of the estate, will be allowed.[2] As this court observed in an analogous context in *In re Rhymes, Inc.*, 14 B.R. 807, 808, 8 B.C.D. 637, 638 (Bankr.D.Conn.1981):

> With respect to unexpired leases, it is well settled that until assumption or rejection of the debtor's lease, the estate is liable only for the reasonable value of the use and occupancy of the property. *In re United Cigar Stores Co.*, 69 F.2d 513 (2d Cir.) *cert. denied sub nom. Reisenwebers, Inc. v. Irving Trust Co.*, 293 U.S. 566, 55 S.Ct. 76, 79 L.Ed. 665 (1934); *In re Standard Furniture Co.*, 3 B.R. 527, 6 B.C.D. 270 (Bkrtcy.S.D.Cal.1980); 2 *Collier on Bankruptcy* Par. 365.03[2] (15th ed. 1979); *See* 3 *Collier on Bankruptcy* Par. 503.04[1][a] (15th ed. 1979). The liability for actual use and occupancy is based on "the equitable principle of preventing unjust enrichment, rather than the compensation of the creditor for

1. Thatcher's Supplemental Memorandum of Law and Supplemental Reply Memorandum of Law, October 7, 1985 at 6.

2. Code § 503(b)(1)(A) is, in pertinent part, essentially the same as § 64a(1), its predecessor under the former Act. It should be noted, however, that because of the recent changes in Code § 365(d), effected by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (Pub.L. No. 98–353), a debtor's liability for post petition use and occupancy of space under an unexpired lease of nonresidential property is no longer determined after a notice and a hearing on a request for payment of an administrative expense. Instead, a debtor-lessee, subject to the 1984 Amendment, is obligated, *inter alia*, to

loss to him." *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 126 (2d Cir.1960).

PGS argues that the GSCI rate is the appropriate measure of the reasonable value of the post petition natural gas it supplied to Thatcher and bases that contention on the logic that had Thatcher sought to purchase natural gas for less than one year, utility regulations in effect would require PGS to charge Thatcher at the GSCI rate. Thatcher, on the other hand, contends that the reasonable value of the natural gas is established by the IS Contract under which the gas was delivered.

While it is true that the reasonable value of post petition goods is not necessarily measured by the price established by the contract under which they were delivered, *see In re California Steel Company*, 24 B.R. 185, 188–189 (Bankr.N.D.Ill.1982), the contract rate is presumed to be reasonable. *See S & W Holding Company v. Kuriansky*, 317 F.2d 666, 667 (2d Cir.1963), *quoting*, 3 *Collier On Bankruptcy*, 1516 (14th ed. 1961):

> The *quantum* of allowance for use and occupation by the receiver or trustee is measured by "the reasonable value of such use and enjoyment." Ordinarily this will be the contractual rental, *pro rata temporis*, unless it is shown that the contractual rental itself is clearly unreasonable. There is a presumption to the effect that the contractually reserved rent is reasonable.

timely perform all lease obligations, including the full payment of rent as prescribed by the lease. But since this Amendment only relates to nonresidential leases, the judicial decisions and commentary which defined pre 1984 Amendment liability for administrative expense remain viable and relevant as guides for determining liability for all other administrative expense under § 503(b)(1)(A). *See Midlantic Bank v. N.J. Dept. of Environmental Protection*, — U.S. —, 106 S.Ct. 755, 759–760, 88 L.Ed.2d 859 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.").

*See also, In re First Research Corporation,* 457 F.2d 331, 332–333 (5th Cir.1972); *In re Vermont Real Estate Investment Trust,* 25 B.R. 809, 811 (Bankr.D.Vt.1982). Therefore, in calculating the reasonable value of the post petition natural gas supplied by PGS, it is necessary in the first analysis to consider the IS Contract.

Under the IS Contract, Thatcher was required, *inter alia,* to purchase and pay for a minimum volume of natural gas over a period of not less than one year. *See* stipulation ¶ 2, *supra,* at 2. The contract is silent as to the price for thermal units of the natural gas as purchased for a period of less than one year. It therefore might be argued that since PGS could have but did not insist upon the substitution of the higher GSCI rate upon Thatcher's default, the IS rate for the thermal units actually delivered is what the parties intended. Although such a contention is not without merit, it is not persuasive. The contractual arrangement between these parties must not be viewed in a vacuum. Rather, this court must recognize that the public served by the regulatory agency has an interest in rates charged for natural gas and that the lower IS rate is contrary to the guidelines of the public authority. Moreover, this court recognizes that while the contract rate is presumed to be reasonable, the presumption is not conclusive, *see In re First Research Corporation, supra,* 457 F.2d at 332–333, and must yield if the contract rate is shown to be unreasonable. *See S & W Holding Company v. Kuriansky, supra,* 317 F.2d at 667–668.

Since the commodity here is not an item that may be purchased in an open free market, traditional means of determining its reasonable value are not available. This court is accordingly left with a choice of two rates, the IS and the GSCI rates, established by a regulatory agency. *See* stipulation ¶¶ 2 and 3, *supra,* at 2. Under those circumstances in order to ascertain which rate Thatcher should pay, the question evolves, what would any consumer under the same circumstances as presented here have to pay?

If this were any other contract for the bulk purchase of goods, discounted because of minimum purchase requirements, and the contract were rejected by a debtor under bankruptcy law, the reasonable value of the goods delivered prior to rejection would be what the debtor would have to pay for them under market conditions at the time of delivery.

■ The reasonable value of the natural gas delivered post petition to Thatcher is what Thatcher would have to pay for it. There is no question but that Thatcher would have to pay at the GSCI rate for the delivery of gas for less than one year. Thatcher bargained for a reduced rate and got it because, among other conditions, it qualified by promising to purchase an annual minimum volume of natural gas. Thatcher filed a bankruptcy petition approximately three months after the contract commenced, and now seeks to impose the lower IS rate as presumably reasonable. In a sense, Thatcher seeks to assume the IS rate and reject the rest of the contract, a practice which has been disallowed by other courts and will not be permitted here. *Compare In re Italian Cook Oil Corp.,* 190 F.2d 994, 996–997 (3d Cir.1951):

> A trustee is, of course, under no obligation to complete executory contracts of a debtor. By Section 70, sub. b of the Act, the trustee is given the right to adopt or reject an executory contract. He must do one or the other. If the trustee deems the contract to possess no equity or benefit for the estate he rejects it as burdensome. If, on the other hand, he concludes that the executory contract does have an equity for the estate he adopts it. These principles of law have become too well established to permit of doubt. *Atchison, Topeka and Santa Fe Railway v. Hurley,* 8 Cir. [1907], 153 F. 503, affirmed 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 [ (1909) ]. The trustee, however, may not blow hot and cold. If he accepts the contract he accepts it *cum onere.* If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.

I find that the IS rate is not an accurate measure of the reasonable value of the post petition natural gas delivered to and used by Thatcher. Accordingly, PGS's motion is granted, and it is Ordered that the automatic stay is modified to allow PGS to deduct $187,927.65 from the security deposit paid by Thatcher, representing the balance due for post petition natural gas computed at the GSCI rate, and that, after making this deduction, PGS shall return the balance of the deposit, together with accrued interest, to Thatcher.