**In the Matter of WASHINGTON–ST. TAMMANY ELECTRIC COOPERATIVE, INC., Debtor.**

**Bankruptcy No. 87–03106.**

United States Bankruptcy Court, E.D. Louisiana.

April 20, 1989.

Douglas S. Draper, Friend, Wilson & Draper, New Orleans, La., John H. Ward, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill., William J. Burris, Franklinton, La., for debtor.

Edward M. Heller, Jan M. Hayden, Bronfin, Heller, Steinberg & Berins, New Orleans, La., William H. Patrick, III, David A. LeClere, Schwab & LeClere, Baton Rouge, La., J. William Boone, Atlanta, Ga., for Cajun Elec. Co-op., Inc.

John J. List, Corp. Counsel, NRUCFC, Washington, D.C., Wilbur F. Foster, Jr., Alan W. Kornberg, Milbank, Tweed, Hadley & McCloy, New York City, Eugene R. Preaus, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for National Rural Utilities Co-op. Finance Corp.

J. Christopher Kohn, Janice Alperin, Andrew H. Stone, Dept. of Justice, Civ. Div., Commercial Litigation, Washington, D.C., Michael W. Kelly, Asst. Gen. Counsel, Elec./Telephone Div. Dept. of Agriculture, Washington, D.C., for Rural Electrification Administration (U.S. Dept. of Agriculture).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THOMAS M. BRAHNEY, III, Chief Judge.

This matter came before the Court on an Emergency Motion for Interim Relief on Motion for Payment of Administrative Expense, for Adequate Assurance of Payment for Utilities Service, and for Adequate Protection of Interest filed on June 14, 1988 by Cajun Electric Cooperative, Inc. ("Cajun"). Cajun's original Motion for Administrative Expenses was filed on August 13, 1987. Its initial Memorandum in Support of this Motion was filed on October 20, 1987. A

Memorandum supporting the Emergency Motion was filed by Cajun on July 18, 1988. Debtor, Washington–St. Tammany Electric Cooperative, Inc., filed its Opposition to Cajun's original Motion on October 27, 1987 and a Response to the Emergency Motion was filed on July 6, 1988. A Response to Cajun's Emergency Motion was also filed by the National Rural Cooperative Utilities Finance Corporation, on July 14, 1988. Hearings on this matter were held on July 19, August 10, September 26, and October 20, 1988. Post-trial Memoranda and proposed Findings of Fact and Conclusions of Law were submitted by both parties. After considering the evidence, both testimonial and documentary, offered at the hearings, reviewing the record in the case, including the briefs filed by the parties, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code on July 17, 1987. Debtor has since continued in the operation of its business as a debtor-in-possession and has, throughout the pendency of this case, continued to sell power to its customers/members.

2. Debtor is one of the thirteen member distribution cooperatives that form and comprise Cajun and is also a Louisiana electric cooperative and a non-profit corporation. Debtor is engaged in the business of purchasing and reselling wholesale electric power to its retail customers/members. Debtor's sole supplier of wholesale power, and its major creditor, is Cajun.

3. On September 9, 1976, Debtor entered a Superseding Wholesale Power Contract (the "Contract"). The Contract provides that Debtor will purchase and Cajun will sell "all requirements" for wholesale electric power which Debtor shall need for its system. Under the Contract, Debtor is required to pay for all electric power and energy furnished at the rates set by the Board of Directors of Cajun. The rates are apparently set at a level just sufficient to meet Cajun's cost of operation and maintenance of its facilities.

4. The current contractual rate charged to Debtor for wholesale electric power is approximately 5.2¢ per kilowatt hour (kwh). The effective rate varies from month to month depending on fuel adjustment and load factor. The Contract entered into between Debtor and Cajun is similar in its significant aspects to the power supply contracts entered into between Cajun and its other twelve member distribution cooperatives. Cajun's rate schedule is not subject to approval by the Louisiana Public Service Commission.

5. Cajun's monthly bill to Debtor, as well as its other members, is divided into component parts. The bill contains a demand charge, an energy charge and a fuel adjustment factor. Among cooperative utilities nationwide, including Cajun members, rates are apparently established by negotiation and consensus among the member cooperatives. While some costs are demand related and some are energy related, classification of the costs into demand and energy related is only one step in the process of rate design. It is the average cost (energy plus demand) per kwh that is customary and accepted in the industry to compare effective rates.

6. The opinions of expert witnesses who testified for the Debtor and Cajun regarding the rate which would represent the fair market or reasonable value of electric service like that furnished by Cajun to the Debtor are as follows:

Arthur Simon (Debtor)—4.0–4.5¢ per kwh

James Fairman (Debtor)—4.25–4.3¢ per kwh

Frederick McCoy (Cajun)—4.6–5.4¢ per kwh

Mr. McCoy's estimate did include adjustments for certain cost factors included in the Cajun–Debtor contractual rate and not necessarily included in the rates offered as comparables from other suppliers.

7. During the summer months, Cajun's members, including the Debtor, are billed for actual demand and for the remainder of the year are billed for 80% of the average consumption of the four summer months. The Debtor's system is "winter-peaking"

and, therefore, in most months actual demand exceeds billing demand.

8. Since the date of the filing of the Petition, Cajun has sold and the Debtor has accepted all of Debtor's requirements for wholesale power. Immediately after filing, Debtor paid 4.5¢ per kwh for electricity supplied by Cajun. On November 17, 1987, Cajun and the Debtor entered into a "Standstill Agreement." This agreement required Debtor to pay Cajun from "available funds" the full contractual rate for the electricity sold to Debtor for the period from November 1987 through March 1988 (billed in December 1987 through April 1988). Numbered paragraph 1 of the agreement provides as follows:

> WST intends to pay and will pay Cajun for power supplied by Cajun during November 1987 through March 1988 ... the full price, as set forth in the all-requirements contract, from "available funds," i.e., cash not otherwise committed for: a) disaster reserves ($2,000,000.00), b) REA/CFC debt service, c) refunds of overcharges, d) operational requirements, and e) cash reserves (not to exceed $1,250,000.00).

Debtor made these payments for power supplied in November and December 1987. Debtor reduced its payments for January, February and March 1988 to 4.5¢ per kwh. Debtor ceased making any payments to Cajun for power supplied in April, May and June. In July of 1988, Debtor paid $338,026.78, which brought the total post-petition payments up to the total post-petition energy charge billings. This energy charge is approximately 3.7¢ per kwh.

9. In the Standstill Agreement, Cajun and the Debtor reserved their rights in regard to the difference between the 4.5¢ per kwh paid by the Debtor and the price that the Debtor would have paid under the Contract for post-petition periods prior to that covered by the November 1987 billing and subsequent to that covered by the March 1988 billing. The agreement does not reserve the parties' rights to contest the value of that power supplied *during* the standstill period.

10. The agreement does contain certain provisions for payments if the "available funds" were insufficient to pay for power supplied. These provisions include using some of the disaster funds to make payments and then, if the disaster fund were consequently depleted, deferring some payments to replenish the disaster fund. Also included is a provision to be used if the disaster fund is exhausted and payments are still due. In this case, the 4.5¢ figure was to be used and the shortfall owed later. The agreement does not provide for using full contractual payments made to cover months where only 4.5¢ per kwh or nothing at all was paid. Further, no evidence was presented that the disaster fund had to be used to make payments.

11. The payments were made at the full rate to be applied against a particular monthly invoice. Specific invoices from Cajun which contained demand and energy charges were paid during the standstill period. The Debtor apparently did not direct that its payments during the standstill period be applied to the energy charges only, but rather that the remittances be applied to the particular month's invoice. Credit was given accordingly. Payments during the standstill period were to be based on the total billing from Cajun. There is nothing in the agreement indicating an intent on the part of either party to apply payments made to anything other than the total monthly billings; nor was there any evidence presented to this effect.

12. The cumulative total of Debtor's post-petition payments to Cajun equal only the total cumulative post-petition energy charges, including fuel adjustment. This is apparently due to Debtor's "recapture" and reallocation of funds previously paid Cajun in excess of the energy charges. Effectively, Debtor has paid Cajun nothing post-petition toward the demand charge and has paid nothing above the energy charge during the standstill period.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

2. Cajun seeks in its Motion to be allowed, as an administrative expense under 11 U.S.C. § 503(b)(1)(A), payment for post-petition wholesale electric power supplied to Debtor. Cajun asserts that this administrative expense should be at the full contractual rate or, alternatively, at fair market value. The Debtor does not seem to disagree that § 503(b)(1)(A) entitles Cajun to some administrative expense, but does take the position that administrative treatment should *not* be accorded to Cajun's full billing at the contractual rate. Rather, Debtor asserts the administrative expense should be only the energy charges, not as billed by Cajun, but as represents only the variable costs to Cajun of supplying the power. Alternatively, Debtor proposes that the administrative expense should be paid at fair market value only. After determining the appropriate applicable rate under § 503, this Court must also determine the effect, if any, of the Standstill Agreement upon the administrative payments due Cajun.

■ 3. 11 U.S.C. § 503(b)(1)(A) allows an entity providing goods or services to an estate post-petition to request payment for these goods or services as an administrative expense. *See, In re Thatcher Glass Corp.*, 59 B.R. 797 (Bankr.D.Conn.1986). Under 11 U.S.C. § 503(b)(1)(A), after notice and a hearing, the reasonable value of the actual and necessary costs and expenses of such goods and services, used to preserve the estate, may be allowed as administrative expenses. *Id.* at 799. *See also, Matter of Braniff Airways, Inc.*, 783 F.2d 1283 (5th Cir.1986) and *In re Sharon Steel*, 79 B.R. 627 (Bankr.W.D.Pa.1987). Such administrative expense treatment has been accorded to utility service provided to the debtor post-petition. *See, e.g., In re Sharon Steel, supra* and *In re Thatcher, supra.* In the instant case, there would be no Debtor operations without the power supplied by Cajun; therefore, the Court finds that the payment for electric power supplied to Debtor by Cajun post-petition is entitled to administrative expense treatment.

■ 4. There is an initial assumption that, where a contract exists, the contractual rate is the reasonable value of the goods or services provided to the estate. *Matter of Braniff Airways, supra* at 1285; *In re Thatcher Glass, supra* at 799; and *In re GHR Energy Corp.*, 41 B.R. 668 (Bankr.D. Mass.1984). This presumption is viable unless the debtor introduces *convincing* evidence to the contrary. *In re GHR, supra* at 672. *See also,* 3 *Collier on Bankruptcy,* ¶ 503.04, p. 503–25 (15th ed. 1988). Ultimately, what is most important is whether and to what extent the goods or services provided benefitted the estate. *Matter of Braniff, supra* at 1285; *In re Central Foundry Co.*, 62 B.R. 52 (Bankr.N.D.Ala. 1985); and *In re California Steel*, 24 B.R. 185 (Bankr.N.D.Ill.1982).

■ 5. Debtor relies mainly on *In re Central Foundry* and *In re California Steel* to support its primary position that Cajun is entitled to receive as an administrative expense only the energy charges which represent its variable costs. In these two cases, the courts addressed the allowance of minimum demand charges for utility service as administrative expenses. In both cases, these minimum charges were not accorded administrative treatment. Thus, Debtor here asserts that demand charges cannot be allowed as administrative expenses as a matter of law. However, *In re Central Foundry* and *In re California Steel* are distinguishable from this case.

First, neither of these cited cases, nor indeed any of the cases cited by either party, involve provision of gas or electricity service to a business such as the Debtor's which is actually reselling that same utility service to customers post-petition. Second, the debtors in *Central Foundry* and *California Steel* were being billed a *minimum* demand charge for service they were not receiving. In *Central Foundry*, the business had been shut down and no gas was being consumed. Nevertheless, the debtor was billed $2500.00 by Alabama Gas Corporation representing a minimum demand charge. This, the court decided, did not benefit the estate, only Alabama Gas, and

was not therefore an allowable administrative expense. Similarly, in *California Steel* the expenses in question were for the minimum demand charges on the debtor's electric bill from Commonwealth Edison Company. The debtor's demand for electricity had fallen below the level at which minimum demand was charged and the court found that the minimum charges were not of value to the estate, disallowing the charges as administrative expenses.

In the present case, the administrative payments sought by Cajun are not for power the Debtor did not use. On the contrary, the Cajun billings are for power supplied to the Debtor which the Debtor then resold. This is clearly of value to the estate in that it is crucial to maintaining the viability of the Debtor's business. Moreover, Debtor is not being billed a *minimum* demand charge; all demand charges are for electricity actually delivered and used. Indeed, the Debtor's actual demand for power in most months exceeds the billing demand. The holdings of *Central Foundry* and *California Steel* are fact-specific and thus would not apply to a case, such as the present one, in which the facts differ significantly. Additionally, in another case on the same subject, *In re Sharon Steel, supra,* the court specifically rejected the approaches taken in *Central Foundry* and *California Steel,* that is, dividing utility charges into minimum demand charges and cost of electricity charges, disallowing the minimum demand charges. In *Sharon Steel,* the court advocated the approach of considering other rate schedules in effect as a pertinent factor. In view of these considerations, this Court is of the opinion that the decisions in *Central Foundry* and *California Steel* do not apply to the case at hand. Consequently, the Court will not limit Cajun's administrative expenses to the energy charges only, whether determined by Cajun's billings or by the "variable costs" method proposed by the Debtor.

■ 6. The question remains, however, whether the administrative expenses are to be allowed at the full contractual rate or at some other reasonable or fair market rate. In *In re Thatcher Glass* and *In re Sharon*

*Steel,* the courts noted that "reasonable value" involving utility service must take into account any contract rate and the regulated rates charged to customers other than the debtor. In fact, the court in *Thatcher Glass* found that the contract rate was *below* the reasonable value of the service when compared to the regulated industrial rate and allowed the *higher* regulatory rate as an administrative expense. In *Sharon Steel,* the contract involved required the debtor to take a minimum amount of gas each month and provided a minimum demand charge, which the regulated rate for individual customers did not. Thus, the court in that case allowed the administrative expenses at the regulated rate.

In the instant case, Cajun's rates are *not* regulated by the Louisiana Public Service Commission and, therefore, there are no regulated rates to compare to Debtor's contract rate as there were in *Thatcher Glass* and *Sharon Steel.* Further, the Debtor's Contract apparently does not require minimum demand each month. Consequently, the decisions in *Thatcher Glass* and *Sharon Steel* do not really compare on their facts with this case.

In this case, the reasonable or fair market value of the service in question is more difficult to determine than in the previously cited cases. The only rates available for comparison to the rate of the Contract are those ostensibly available to Debtor on the "free market" outside of the cooperative system. In examining these rates, the Court has attempted to review the testimony of the experts without regard to demand or energy charges, but rather in view of the average cost of electricity per kwh. As previously stated, the expert opinions regarding the fair market value of the service Cajun provides Debtor ranged from 4.0 to 5.4¢ per kwh. Of note, however, is the fact that the estimates of Debtor's experts generally did not take into account the fact that some factors included in the Cajun rate would have to be added to the rates available from other suppliers to make the rates realistically comparable. This would increase to various extents the rates quoted by these suppliers. Of fur-

**561**

ther note is the fact the there was no evidence offered that Cajun's method of setting the rate of the Contract (i.e. the factors used) is not industry custom. The contractual rate, 5.2¢ per kwh, is within the range proposed by the experts and is, therefore, comparable to other available Louisiana rates. Consequently, since Debtor has not offered convincing evidence to the contrary, the Court finds that the contractual rate is the reasonable value of the electric power provided by Cajun to the Debtor.

 7. Finally, the Court must address the effect of the Standstill Agreement upon the administrative expenses to be allowed. Apparently, Debtor's position is that the post-petition amounts paid to Cajun over 4.5¢ per kwh, and especially the two months paid at the full contract rate, can be "recaptured" and reallocated to pay energy charges, including fuel adjustment, for the remaining post-petition months. However, the Standstill Agreement makes specific provisions for shortfall in payments, which provisions do not include the reallocation method proposed, and indeed apparently unilaterally implemented, by Debtor. Furthermore, there is no evidence of any intention on the Debtor's part or on Cajun's part to have the December and January payments applied to anything other than the full billings for November and December. The effect of the allocation proposed would be an abrogation of the provisions of the Standstill Agreement that this Court will not allow. Moreover, as a practical matter, since the Court has concluded that the contractual rate will be allowed as an administrative expense, the Debtor will have no "excess" payments to reallocate, but rather will have to pay the full contract rate for the entire post-petition period, with the possible exception of any applicable shortfall provisions in the Standstill Agreement.

## JUDGEMENT

For the reasons assigned in the foregoing Findings of Fact and Conclusions of Law entered herein by the Court this date,

IT IS ORDERED, ADJUDGED AND DECREED that Cajun's Emergency Motion for Interim Relief on Motion for Payment of Administrative Expense, for Adequate Assurance of Payment for Utilities Service and for Adequate Protection of Interest be, and it is hereby, GRANTED with regard to the payment of administrative expense. All other requests for relief in Cajun's original Motion are MOOT; and

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the post-petition administrative expenses requested by Cajun will be allowed at the rate set out in the Superseding Wholesale Power Contract between Cajun and the Debtor dated September 9, 1976.