In re SHARON STEEL
CORPORATION,
Debtor.

Bankruptcy No. 87–00207E.
Motion No. 87–838E.

United States Bankruptcy Court,
W.D. Pennsylvania.

Nov. 23, 1987.

Stanley Levine, Pittsburgh, Pa., for debtor.

## MEMORANDUM AND ORDER

WARREN W. BENTZ, Bankruptcy Judge.

The matter comes to be heard on the motion of Sharon Steel Corporation ("Sharon") seeking court approval of its Rejection of an Executory Contract with National Fuel Gas Distribution Corporation ("NFG") dated June 15, 1976.

### Factual Background [1]

Sharon, a manufacturer of steel and steel products, filed its voluntary petition pursuant to Chapter 11 of the Bankruptcy Code on April 17, 1987 and since that time has remained in possession of its property and in control of its affairs as debtor-in-possession.

NFG is a natural gas public utility which serves, among other places, the market area of northwest Pennsylvania where Sharon's Wheatland Borough and Farrell, Pennsylvania plants are located.

On or about June 15, 1976, Sharon and NFG entered into a natural gas service agreement. Under this service agreement, NFG agreed to provide natural gas service to Sharon's facilities in Wheatland Borough and Farrell, Pennsylvania. As a result of Sharon's large demand for natural gas, NFG agreed to provide Sharon with natural gas service under a special rate schedule for Large Industrial Service (the "LIS Rate"). The LIS Rate provided a lower price per Mcf of natural gas in exchange for Sharon's agreement to pay a monthly demand charge and take a minimum amount of gas each month. This service agreement was amended in 1979 and 1983 which together with the original agreement will be collectively referred to as the "Service Agreement."

In December 1985, Sharon exercised a termination option contained in the Service Agreement. The termination option contains a two-year notice period. Thus, the Service Agreement is to expire in December, 1987.

Prior to the filing of its petition, Sharon had been making payments to NFG weekly in advance for the natural gas pursuant to an order of the Pennsylvania Public Utility Commission ("PUC"). Upon the filing of the petition, NFG, as a public utility, filed a motion for an order requiring Sharon to immediately furnish adequate assurance of payment pursuant to 11 U.S.C. § 366. At a hearing on NFG's motion on April 30, 1987, a stipulation was read into the record. The stipulation provided that Sharon was to continue making weekly payments in advance under the existing arrangement ordered by the PUC. The stipulation was incorporated into a written stipulation and approved by this court on May 22, 1987.

Sharon is currently the only customer purchasing natural gas from NFG under the LIS Rate. NFG does, however, provide natural gas to other industrial customers. These large volume industrial customers are provided natural gas under a different rate schedule referred to as the LVIS Rate. Sharon would be eligible for service under the LVIS Rate in the absence of its current Service Agreement. At the time Sharon filed its petition, gas service under the LVIS Rate was no lower at Sharon's average monthly usage level than for service under the LIS Rate pursuant to the Service Agreement. On August 1, 1987, new LVIS rate schedules became effective pursuant to an annual PUC ruling. The new LVIS Rate substantially reduced the cost of gas and made the LVIS Rate far more attractive to Sharon than the LIS Rate provided for in the Service Agreement. The LVIS rate would become applicable to Sharon when it is no longer bound by its agreement to purchase gas at the LIS rate.

---

**1.** This opinion constitutes this court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052.

On August 12, 1987, Sharon filed a motion seeking court approval of its rejection of the Service Agreement. The motion sought to reject the Service Agreement as of the date immediately prior to the filing of Sharon's petition for relief under Chapter 11, or, in the alternative, as of August 1, the date on which the new LVIS Rate became effective. In addition, Sharon argued that NFG is entitled to an administrative claim only for the reasonable value of the benefit Sharon has received from the natural gas service or alternatively, the fair market value of the natural gas service which NFG has provided since the date of the filing of the petition. Sharon further asserts that if it has paid a sum in excess of the administrative claim to which NFG is entitled, then Sharon requests that excess sum be applied to its future obligations to NFG.

NFG argues that the stipulation constituted a post-petition contract which could not be rejected or, alternatively, the Service Agreement has been assumed by virtue of the court-approved stipulation. NFG further contends that the Service Agreement, as a public utility contract, should not be regarded as an executory contract for purposes of § 365 of the Bankruptcy Code. In addition, NFG alleges that Sharon acted in bad faith and should be precluded from rejecting the Service Agreement. Finally, if Sharon is permitted to reject the Service Agreement, NFG asserts that the effective date of the rejection should be the date an order is entered approving the rejection.

### Discussion

As a public utility, NFG had the right to demand adequate assurance of payment under § 366. If Sharon did not provide for adequate assurance within 20 days after the date of the order for relief, NFG had the right to discontinue natural gas service to Sharon under 11 U.S.C. § 366(b). This court approved a stipulation for adequate assurance pursuant to § 366 which essentially provided for the same terms and conditions (i.e., advance payments) under which the parties were performing prior to the filing of the petition. We find no merit in NFG's argument that the adequate assurance stipulation provided by Sharon pursuant to § 366 constituted a post-petition contract. The stipulation approved by this court provided only adequate assurance for payment of postpetition service under § 366(b).

NFG further argues that the stipulation constituted an assumption of the Service Agreement. This court has not been presented with a motion to assume the contract under 11 U.S.C. § 365(a) nor has there been notice thereof to creditors, nor a hearing held thereon, nor has a plan of reorganization been confirmed. Accordingly, we dismiss this contention as without merit. We also decline to hold that an implied or defacto assumption occurred with court approval. The facts and equities in the instant case do not support such a finding.

NFG does, however, raise an issue not directly addressed by this court before. NFG contends the Service Agreement should not be regarded as an executory contract for purposes of rejection under § 365. There are relatively few cases discussing the treatment of utility service contracts under § 365. *See Wheeling–Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling–Pittsburgh Steel Corp.),* 72 B.R. 845 (Bankr.W.D.Pa.1987); *Peoples Gas System, Inc. v. Thatcher Glass Corp. (In re Thatcher Glass Corp.),* 59 B.R. 797 (Bankr.D.Conn.1986); *Crownover v. Alabama Gas Corp. (In re Central Foundry Co.),* 62 B.R. 52 (Bankr.N.D.Ala.1985); *and In re California Steel Co.,* 24 B.R. 185 (Bankr.N.D.Ill.1982). In *Wheeling–Pittsburgh,* the utility company did not dispute that the contract was an executory contract for purposes of assumption or rejection under § 365. We held that in determining, under the business judgment test, the propriety of a debtor's decision to reject a public utility contract, we will not weigh the effect of rejection on the public utility, its customers, or state laws regulating public utilities. 72 B.R. 845 (Bankr.W.D.Pa. 1987).

In *Thatcher Glass,* the issue before the court was the determination of the appropriate rate for calculating the administra-

tive expense after the debtor rejected a natural gas service contract. 59 B.R. 797 (Bankr.D.Conn.1986). In both *Wheeling–Pittsburgh* and *Thatcher Glass,* the parties did not dispute the status of the utility service contract. The public utility contracts involved in these cases were presumed to be executory contracts for the purposes of 11 U.S.C. § 365.

■ In *California Steel,* the court directly addressed the status of a utility service contract, and held that such a contract fell within the scope of § 365. 24 B.R. 185 (Bankr.N.D.Ill.1982). We are in agreement with *California Steel* insofar as the executory nature of a utility service agreement is concerned. There is no question that performance remains due to some extent by both NFG and Sharon. The Service Agreement calls for performance in the future by both parties: NFG is required to provide natural gas service and Sharon is obligated to pay for a minimum of 400,000 Mcf of natural gas at the specified LIS Rate.

NFG argues that the interplay of 11 U.S.C. § 365 and § 366 together with the rate as fixed by the PUC dictate that the Service Agreement should not be regarded as an executory contract. Rather, NFG contends the Service Agreement should be regarded as a rate schedule subject to the jurisdiction of the PUC. We find no basis in the legislative history nor the Bankruptcy Code to exempt a utility service contract from the provisions of § 365. Nor do we believe that contracts with public utilities should receive more favorable treatment in light of the protections afforded under § 366 and for the reasons set forth in our decision in *Wheeling–Pittsburgh.* Any adverse effects on the utility and its customers may be pertinent in determining the amount of prepetition damages resulting from the rejection. We therefore conclude that public utility contracts are subject to the provisions of 11 U.S.C. § 365.

■ Having concluded the Service Agreement may be rejected pursuant to § 365, Sharon's motion to reject will be approved for the reasons set forth in *Wheeling–Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling–Pittsburgh Steel Corp.),* 72 B.R. 845 (Bankr.W. D.Pa.1987). The record does not support NFG's contention that Sharon's decision to reject was motivated by bad faith. Thus no discussion is necessary on this facet.

Sharon has demonstrated that rejection of the executory contract will benefit the estate. The benefit Sharon may receive from rejecting the Service Agreement may not result in substantial savings or last for a great period of time. Indeed, the Service Agreement is scheduled to terminate in only a few months. But, as we stated in *Wheeling–Pittsburgh,* "[o]nce the debtor establishes that rejection will benefit the estate, our inquiry ends." *Id.* at 847. Rejection of the Service Agreement will place Sharon in the group for non-contract large industrial service. In other words, the rate schedule Sharon is to use in computing its obligation to NFG will be the LVIS Rate.

The penultimate step in our analysis addresses the status of the parties' obligations prior to rejection. NFG contends that Sharon should be liable for all of the contractual obligations of the Service Agreement performed under the Stipulation until the Service Agreement was rejected. In essence, NFG argues that the effective date of rejection should be the date on which an order is entered approving the rejection. We disagree. NFG's position would implicitly circumvent § 365(g)(1) which provides that rejection of an executory contract operates as a breach of the contract as of the date immediately prior to filing the petition under the Code. For the same reason, we also do not agree with Sharon's alternative contention that the rejection of the Service Agreement should be effective as of August 1, 1987, the date on which the new LVIS rate became effective.

The dispute over the effective date of rejection arises in a rather unique context. The effective date of rejection became an issue in determining whether any portion of the payments made to NFG may be recouped. The payments made to NFG under the Service Agreement were approved by this court as adequate assurance

of payment under § 366. When we approved the Stipulation, we were not requested to determine the extent to which the payments were actual and necessary to preserve the estate nor was there a reason to do so. The issue only comes into focus when there are alternative utility services and corresponding rates available to the debtor.

It would appear that in most smaller cases where a utility is involved, this would not become an issue due to the fact that there would be only one service at a uniform rate available to all customers. In such a case, we would presume that the amount charged by the utility for service is the actual and necessary cost of preserving the estate. Here, however, large industrial customers have two separate rates from which to choose. These rates are based upon the type of service provided. Now that we have approved Sharon's rejection of the Service Agreement, we must decide to what extent, if any, the payments made to NFG were administrative expenses. Section 503(b)(1)(A) of the Bankruptcy Code limits the valuation of administrative expenses to the actual and necessary costs and expenses of preserving the estate.

NFG argues that the actual, necessary costs and expenses of preserving the estate under § 503(b)(1) is presumptively the rate established by the contract. *See In re Ram Mfg.*, 38 B.R. 252 (Bankr.E.D.Pa. 1984). This argument was rejected in a similar context to that here by both *In re Thatcher Glass*, 59 B.R. 797 (Bankr.D. Conn.1986) and *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891 (Bankr. E.D.Pa.1987). Such a presumption may be more appropriate with a lease of real or personal property than in a situation where goods or services are the subject of the executory contract.

In *Thatcher Glass*, the court recognized that traditional means of determining the reasonable value of the service was not available for utility service contracts since this type of service is not available in an open free market. Rather, the rates charged by the utility are governed by public utility regulations. The court noted that if the debtor did not receive service under a contract rate schedule, the debtor would have been charged for the utility service at the same rate as all other utility customers without such contracts. Accordingly, the court held the reasonable value of the utility service would be calculated using the non-contract rate schedule as set by public utility regulations.

The court in *In re Grant Broadcasting of Philadelphia, Inc.* recognized that there are public policy considerations for classifying certain financial commitments from creditors to a debtor as administration expenses. 71 B.R. 891, 897 (Bankr.E.D.Pa. 1987). The court stated:

> Generally, this policy is to encourage creditors to supply necessary resources to debtors post-petition. However, we believe that the furtherance of this policy is diminished where, as here, the creditor is asserting that its administrative claims arise as a result of prepetition executory contracts which commit creditors to supply resources, as opposed to contracts which are formulated postpetition.

*Id.*, at 897. The court declined to hold the debtor liable for the contract rate prior to rejection, but rather set forth the method by which the non-debtor party to the contract should protect itself from a delayed decision to reject the executory contract:

> We must also observe that we are distressed when we consider the impact which our embrace of the Programmers' stance would have upon the operation of § 365(d). The Code provides the debtor with a certain period wherein he can choose which executory contracts he will accept and which he will reject. If the Programmers' position were accepted, we would place the debtors in the position of being liable for their full contract obligations on executory contracts prior to acceptance or rejection. This would create tremendous pressure upon the debtors to reject as many contracts as quickly as possible. The Code, at § 365(d)(2), accords the debtor a "breathing space" in the period until the time of confirmation of the plan to make this choice unless the obligee in the executory

contract forces an earlier determination. We believe that the incentive to force a more rapid choice must remain on the obligee.

*Id.*, at 898. For these same considerations we decline to hold Sharon liable for the contract rate during the period prior to rejection. Prospective application of a rejection of an executory contract would minimize the benefits that § 365 provides to the debtor.

Based upon the foregoing analysis, we decline to follow the reasoning of *In re Central Foundry*, 62 B.R. 52 (Bankr.N.D. Ala.1985) and *In re California Steel Co.*, 24 B.R. 185 (Bankr.N.D.Ill.1982).

In *Central Foundry*, the trustee had assumed the gas service contract which included a minimum demand charge. After the foundry ceased operations, the trustee attempted to recover the minimum demand charges that were paid pursuant to the contract. The court held that, because the demand charges were not an actual and necessary expense of preserving the estate, the trustee was entitled to recover those amounts paid for minimum demand charges when the foundry was not operating. The court relied on *In re California Steel Co.*, 24 B.R. 185 (Bankr.N.D.Ill.1982) and stated that the minimum demand charge benefits only one creditor, the gas company, and therefore could not be treated as an administrative expense.

In *California Steel*, the court held that an electric service contract was an executory contract. In addition, by paying for all of the electric service other than the minimum demand charges, the court held that the debtor did not effectively reject the service contract.

However, in determining the status of the unpaid minimum demand charges, the court bifurcated the utility contract into the component parts—the minimum demand charge and the cost of the electricity itself. Based upon state law construing the minimum demand charge and this bifurcation, the court concluded the minimum demand charge was not an actual and necessary expense of preserving the estate and therefore not an administrative expense under § 503(b)(1)(A).

■ Recognizing that contracts with public utilities should not receive more favorable treatment under § 365 than other executory contracts, we do believe that some deference must be given to the rate schedules, established by regulation, that a utility may charge. Rather than bifurcating the utility rate, we believe the proper valuation for purposes of determining the administrative expense status is to look to pertinent rate schedules in effect.

By approving the rejection of the Service Agreement, Sharon will be in the same position as NFG's other large industrial customers who do not operate under a contract which obligates the user to pay a demand charge and take a minimum amount of gas each month. These large industrial customers are provided natural gas under a rate schedule referred to as the LVIS rate. In the absence of evidence to the contrary, we presume the LVIS Rate to be an accurate indication of the actual and necessary cost to the estate for providing natural gas service. Therefore, the parties are directed to compute the value of natural gas service provided to Sharon postpetition pursuant to the LVIS Rate. It follows that any amount Sharon has paid in excess of the LVIS Rate during this period may be recouped by Sharon. If, however, the total amount due NFG under the LVIS Rate is greater than payments previously paid, then Sharon shall pay the difference as an administrative expense.

Finally, we hold that NFG is entitled to continue receiving adequate assurance of payment until service is terminated. Sharon shall continue to provide NFG with adequate assurance by paying for services in advance as provided for in the Stipulation approved by this court on May 22, 1987, but payments shall be based on the LVIS Rate.

An appropriate order will be issued.

### ORDER

This 23rd day of November, 1987, for the reasons set forth in the Opinion of this court, it is

ORDERED that Motion No. 87–838E filed by debtors seeking court approval of

debtor-in-possession's rejection of an executory contract with National Fuel Gas Distribution Corporation dated June 15, 1976 shall be, and hereby is, granted, and it is

FURTHER ORDERED that:

(1) Sharon shall compute the value of the natural gas service provided by NFG to Sharon postpetition pursuant to the LVIS Rate in effect at the time the petition was filed. Any change in the LVIS Rate shall be computed from the date the change became effective.

(2) Sharon shall promptly recover any amount paid in excess of the LVIS Rate during this period by credit or otherwise. If, however, the total amount due NFG under the LVIS Rate is greater than payments previously paid, then Sharon shall promptly pay the difference as an administrative expense.

(3) Sharon shall continue to provide adequate assurance of payment as provided for in the Stipulation by paying for the natural gas service in advance. NFG shall compute the amount of each payment by substituting the appropriate LVIS Rate for the LIS Rate currently being used. The Stipulation is hereby modified by this order accordingly.

(4) Debtor shall serve the within order on the current service list.