**SHARON STEEL CORPORATION**

v.

**NATIONAL FUEL GAS DISTRIBUTION CORPORATION, Appellant,**

Intervenor: James W. Toren, Trustee.

No. 88–3386.

United States Court of Appeals, Third Circuit.

Argued Oct. 20, 1988.

Decided April 6, 1989.

Kim R. Tulsky, Kenneth A. Manning (argued), Morgan, Lewis and Bockius, Philadelphia, Pa., for appellant.

Steven Petrikis (argued), Russell J. Ober, Jr., Rose, Schmidt, Hasley and DiSalle, Pittsburgh, Pa., for intervenor, James W. Toren, trustee.

David B. Salzman (argued), Campbell and Levine, Pittsburgh, Pa., for appellee, Sharon Steel Corp.

Before STAPLETON, SCIRICA and COWEN, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This appeal arises from the district court's affirmance of a bankruptcy court order approving the rejection of an executory service agreement between the debtor, Sharon Steel Corporation, and National Fuel Gas Distribution Corporation. National Fuel appeals the district court's decision that the agreement was an executory contract subject to the rejection provisions of Bankruptcy Code, its determination that the effective date of the rejection is immediately prior to the date the debtor filed its bankruptcy petition, and its valuation of National Fuel's service as an administrative expense. We will affirm the judgment of the district court on all issues.

### I.

Sharon Steel Corporation, a manufacturer of steel and steel products, filed a voluntary petition under Chapter 11 of the Bankruptcy Code on April 17, 1987. Since 1976, Sharon has been serviced by the National Fuel Gas Distribution Corporation, a natural gas public utility serving northwest Pennsylvania, subject to regulation by the Pennsylvania Public Utility Commission ("PUC"). In 1976, National Fuel and Sharon entered into a service agreement, to expire December 1987, by which National Fuel agreed to deliver gas to Sharon's steel plants in Wheatland Borough and the City of Farrell under a rate schedule established by the PUC for large industrial users (the "LIS" rate schedule). The LIS rate schedule provided for a minimum consumption of natural gas per month, as well as payment of a commodity and demand charge. Since April 1985, Sharon had been paying National Fuel under the LIS rate schedule pursuant to a weekly advance payment schedule ordered by the PUC in response to a petition by National Fuel to terminate Sharon's service.[1]

Four days after Sharon filed for bankruptcy, National Fuel requested Sharon to furnish adequate assurance of payment pursuant to 11 U.S.C. § 366 (1982). At the bankruptcy court hearing on April 30, 1987, Sharon stipulated that it would provide National Fuel with adequate assurance of payment under the service agreement. The oral stipulation was reduced to writing and approved by the bankruptcy court on May 22, 1987.

At the time of both the filing of the Chapter 11 petition and the date of the stipulation, National Fuel was supplying natural gas to all non-contract large industrial customers pursuant to the rate schedule for large volume industrial users (the "LVIS" rate schedule), at a rate that was not less than the rate Sharon was charged under the LIS rate schedule. However, because of a PUC ruling, National Fuel reduced its LVIS rate on August 1, 1987. As a consequence, the rate charged to other large industrial users dropped below the LIS rate charged to Sharon under the service agreement. Because of this, Sharon notified National Fuel on August 7, 1987 that it intended to reject the service agree-

---

**1.** Sharon had failed to pay its monthly bill on time. Appellant's brief at 6.

ment as an executory contract pursuant to Bankruptcy Code § 365. After a hearing, the bankruptcy court approved Sharon's motion to reject the service agreement in a Memorandum and Opinion dated November 23, 1987.

The bankruptcy court found that the service agreement was an executory contract for purposes of rejection under 11 U.S.C. § 365 (1982).[2] *In re Sharon Steel Corp.*, 79 B.R. 627, 630 (Bankr.W.D.Pa.1987). Relying on *In re California Steel Co.*, 24 B.R. 185 (Bankr.N.D.Ill.1982), the court concluded that the service agreement was executory in nature because obligations under the agreement remained unperformed by both parties. The court disagreed with National Fuel's assertion that the service agreement was merely the embodiment of a rate schedule and thus not susceptible to rejection under § 365.

The bankruptcy court also found that Sharon demonstrated that the estate would benefit from the contract's rejection, *id.* at 630 (citing *In re Wheeling Pittsburgh Steel Corp.*, 72 B.R. 845 (Bankr.W.D.Pa. 1987)), and that under Bankruptcy Code § 365(g)(1), the effective date of the rejection should be the date immediately prior to the filing of the bankruptcy petition.

Because of the rejection of the service agreement, the bankruptcy court was required to decide to what extent, if any, the payments made to National Fuel after filing the bankruptcy petition (the effective date of the rejection) were administrative expenses allowable under § 503(b)(1)(A). Section 503(b)(1) limits the valuation of administrative expenses to the actual and necessary cost and expense of preserving the estate. The court rejected National Fuel's contention that the necessary cost of providing Sharon natural gas and thereby preserving the estate under § 503(b)(1) is presumptively the rate established by the contract. 79 B.R. at 631 (citing *In re Thatcher Glass Corp.*, 59 B.R. 797 (Bankr.D.Conn. 1986); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891 (Bankr.E.D.Pa.

1987)). Rather, the bankruptcy court held that the reasonable value of a utility service should be calculated for purposes of § 503(b)(1) under the non-contract rate set by the PUC (the LVIS rate). Moreover, based on its conclusion that "prospective application of a rejection of an executory contract would minimize the benefits that § 365 provides to the debtor," the court did not require Sharon to pay at the contract rate for natural gas delivered between the date of the filing and the date the court approved its decision to reject the contract. 79 B.R. at 632 (citing *Grant Broadcasting*, 71 B.R. at 897).

Therefore, the bankruptcy court concluded that the LVIS rate represented the actual and necessary cost to the estate for natural gas beginning on the date immediately prior to filing the bankruptcy petition. The court directed National Fuel to remit any excess payment by Sharon if under the LVIS rate, Sharon would have been charged less than it was charged under the service agreement. Alternatively, if the amount due under the LVIS rate would have been greater than that charged under the agreement, National Fuel would be entitled to the difference.

Finally, the bankruptcy court held that Sharon must give National Fuel adequate assurance by paying in advance for all gas. Payments would be made under the stipulation approved on May 22, 1987, but computed at the LVIS rate. The district court, in an order and memorandum opinion, affirmed the decision of the bankruptcy court.

We have jurisdiction under 28 U.S.C. § 158(d)(1982 & Supp. IV 1986).

## II.

We employ the "clearly erroneous" standard in reviewing the district court's review of the bankruptcy court's factual findings. *Resyn Corp v. United States*, 851 F.2d 660, 664 (3d Cir.1988). Our review of the choice, application and

---

**2.** The bankruptcy court found no merit in National Fuel's argument that the adequate assurance stipulation constituted either a post-peti-

tion contract or an assumption of the Service Agreement. 79 B.R. at 629.

interpretation of legal precepts, however, is plenary. *Id.* (quoting *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir.1981)). In *Universal Minerals,* we noted that we are in as good a position to review the bankruptcy court's decision as the district court, and thus we will review the opinion of the bankruptcy court in this case. 669 F.2d at 102.

## A. Executory Contract

■ National Fuel contests the bankruptcy court's characterization of the service agreement as an executory contract subject to the rejection or assumption provisions of 11 U.S.C. § 365[3] because it is under a continuing obligation to provide service under order the PUC's order and consequently would not be excused from performance as a result of the rejection. According to National Fuel, the PUC has ordered it to continue providing service despite Sharon's rejection of the service agreement.

Although the Bankruptcy Code contains no definition of an executory contract, courts have generally relied on the following definition: "[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts in Bankruptcy, Part 1,* 57 Minn.L.Rev. 439, 460 (1973). *See, e.g., Lubrizol Enterpris-*

*es, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1045 (4th Cir.1985) (relying on Countryman's definition), *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *see also N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984) (although Bankruptcy Code provides no definition of executory contract, legislative history of § 365(a) defines the term to mean a contract on which performance remains due on both sides); *In re KMMCO, Inc.,* 40 B.R. 976, 978 (E.D.Mich.1984) (executory contracts are those under which neither party has fully performed).[4]

We find that the service agreement falls within the definition of "executory contract." The agreement is characterized by reciprocal obligations continuing into the future: National Fuel has promised to provide natural gas to Sharon, and Sharon has promised to purchase the gas at a certain price under the LIS rate schedule. These promises were obligatory under the contract until December, 1987. Thus, at the time Sharon moved to reject the agreement, neither party had completed its obligation to the other under the service agreement and performance was due by both parties.

As an executory contract, National Fuel's service agreement with Sharon is subject to rejection under § 365 and the bankruptcy court properly granted Sharon's motion to reject the agreement upon finding that the rejection would benefit the estate. *See In re Wheeling–Pittsburgh*

---

**3.** Section 365 of the Bankruptcy Code provides in part:

§ 365. Executory contracts and unexpired leases

(a) Except as provided in 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

\*   \*   \*   \*   \*   \*

(g) Except as provided in subsections (h)(2) and (j)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, or 13 of this

title, immediately before the date of the filing of the petition; ...

11 U.S.C. § 365 (1982).

**4.** The legislative history of § 365 provides a definition of executory contract:

Subsection (a) of this section authorizes the trustee, subject to the court's approval, to assume or reject an executory contract or unexpired lease. Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 58 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5844, 6303.

*Steel Corp.*, 72 B.R. 845, 846 (Bankr.W.D. Pa.1987) (quoting *In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr.S.D.N.Y. 1984)) (propriety of trustee's decision to reject contract measured under traditional "business judgment test," requiring only that trustee demonstrate that rejection will benefit estate).

■ National Fuel contends that rejection of the agreement is improper, however, in light of its continuing obligation to provide natural gas under the PUC's order, asserting that the "court's order effectively permits a partial rejection of the contract, because Sharon is relieved of its obligation to pay for the natural gas at the scheduled rate, but National Fuel must still deliver the gas." Appellant's brief at 14. While we acknowledge the general principle that a debtor may not reject a contract but maintain its benefits, *e.g., In re Heafitz*, 85 B.R. 274, 283 (Bankr.S.D.N.Y.1988) (trustee may not "blow 'hot or cold' "; he must either reject contract in full or assume contract in full, which includes both benefits and burdens); *cf. Bildisco & Bildisco*, 465 U.S. at 531, 104 S.Ct. at 1199 (citing *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir.1951) (debtor must assume contract *cum onere* )); *In re Airlift Intern., Inc.*, 761 F.2d 1503, 1512 (11th Cir.1985) (if debtor receives benefits of contract, he must adopt its burdens), we find that National Fuel's continuing obligation to provide service as required by state public utility law is not relevant to our § 365 analysis. Sharon's rejection of the service agreement under § 365 merely relieves National Fuel and Sharon from their respective obligations *under the contract.* The fact that one party to the service agreement is a utility and therefore has its provision of service regulated by the PUC does not preclude rejection of the contract by the trustee under § 365. The language of the section is clear: the trustee may assume or reject any executory contract of the debtor. Indeed, we note that unlike collective bargaining agreements and certain real property leases, Congress did not legislate special treatment for utility contracts rejected under § 365. *See* 11 U.S.C. § 1113 (debtor may reject collective bargaining agreement only under certain conditions); 11 U.S.C. § 365(h) (if trustee rejects unexpired lease of real property under which debtor is lessor, lessee has option to terminate or remain in possession). Moreover, as National Fuel's counsel pointed out in the hearing before the bankruptcy court, National Fuel could petition the PUC to terminate service to Sharon, app. at 103a, and the disposition of this action has no effect on their right to do so. Therefore, we find that the service agreement between National Fuel and Sharon Steel is executory and subject to rejection by the trustee under § 365.

■ National Fuel also points out that the parties entered into a stipulation of adequate assurance under which Sharon pledged to continue making weekly payments in advance for natural gas under the service agreement. App. at 90a. National Fuel claimed before the bankruptcy court, and again on appeal, that the stipulation constitutes a post-petition contract or an assumption of the service agreement under § 365. The bankruptcy court was not convinced:

> We find no merit in NFG's argument that the adequate assurance stipulation provided by Sharon pursuant to § 366 constituted a post-petition contract. The stipulation approved by this court provided only adequate assurance for payment of post-petition service under § 366(b).
>
> NFG further argues that the stipulation constituted an assumption of the Service Agreement. This court has not been presented with a motion to assume the contract under 11 U.S.C. § 365(a) nor has there been notice thereof to creditors, nor a hearing held thereon, nor has a plan of reorganization been approved. Accordingly, we dismiss this contention as without merit. We also decline to hold that an implied or de facto assumption occurred with court approval. The facts and equities in this case do not support such a finding.

79 B.R. at 629. We will affirm these findings on appeal.

## B. Date of Rejection

We will also affirm the bankruptcy court's finding under § 365(g)(1) that Sharon's rejection of the service agreement constitutes a breach of the agreement immediately before the date of the filing of the bankruptcy petition. National Fuel objects to "retroactive" rejection of the agreement under § 365(g), claiming that the section does not apply because the service agreement is executory, if at all, only with respect to that part of the contract on which the parties' performance remained due as of the date of the bankruptcy court's order permitting rejection. According to National Fuel, that portion of a long-term service contract that had already been performed post-petition should not be subject to rejection under § 365.

We find no merit in this claim. As we have noted, the legislative history of § 365 provides that an executory contract "generally includes those contracts on which performance remains due to some extent on both sides." *See supra* note 4. Under this definition, the entire contract is executory and subject to the unequivocal language of § 365(g) stating that "the rejection of an executory contract or lease constitutes a breach of such contract or lease ... immediately before the date of the filing of the petition...." 11 U.S.C. § 365. There is no suggestion that Congress intended courts to bifurcate contracts into their performed and unperformed portions, and that only the latter should be considered "executory."

## C. Administrative Expense

Section 503(b) of the Bankruptcy Code allows the payment of administrative expenses, including "the actual, necessary costs and expenses of preserving the estate...." 11 U.S.C. § 503(b). Section 507(a) grants administrative expenses under § 503(b) the highest priority in distribution, and thus administrative expenses will be paid first from the proceeds of the estate. Because we have decided that Sharon may reject the service agreement, and that the rejection relates back to the date that Sharon filed bankruptcy, we must determine under what rate schedule to value Sharon's payment for gas service as an actual and necessary cost and expense of preserving the estate under § 503(b).

■ Prior to this determination, however, we must first address National Fuel's contention that state utility law preempts the bankruptcy court from setting the utility rate under § 503(b). Relying on this court's decision in *Begley v. Philadelphia Elec. Co.*, 760 F.2d 46 (3d Cir.1985), National Fuel argues that Sharon's eligibility for service under the LVIS rate schedule should be determined by the PUC. In *Begley*, we held that 11 U.S.C. § 366(b), requiring the debtor to furnish adequate assurance of payment for post-petition utility service, did not preempt the PUC from commencing termination proceedings against a Chapter 7 debtor who had given a utility adequate assurance of payment, but who had incurred post-petition debts. We held that

> [s]ection 366(b) in the present context has no provision limiting a utility's freedom to act based upon *post-petition* arrearages. Moreover, because we have earlier held that once a Chapter 7 debtor permits post-petition debts to become delinquent the utility may commence termination proceedings, the bankruptcy court's jurisdiction over the issue of adequate assurance under section 366(b) to avoid termination proceedings, is by that time no longer relevant. Once the termination remedy has been sought by the utility in a post-petition context, the "adequate assurance" provision of § 366 no longer has vitality.

*Id.* at 50 (emphasis in original). Although we held that the PUC could assert jurisdiction, and that it was not preempted by federal bankruptcy law, we limited the holding: "We stress at the outset that these questions are presented here in the narrow context of a Chapter 7 liquidation, in which the bankruptcy court has no jurisdiction over post-petition wages or debts of the debtor." *Id.* at 49. In addition, we were careful to distinguish *Begley* from a case in which the PUC dismissed a complaint seeking an amortized payment sched-

ule by a debtor because, in a Chapter 13 reorganization, the bankruptcy court retains jurisdiction over both pre-petition and post-petition income and obligations. *Id.* at 50 (citing *Anyanwu v. Philadelphia Elec. Co.,* 55 Pa.P.U.C. 221, 222 (Pa.Pub.Util. Comm.1981)). Similarly, in this case commenced under Chapter 11, the bankruptcy court retains jurisdiction post-petition. Therefore, we decline to read *Begley* as holding that the PUC must determine the ratemaking issues presented by this case. Nevertheless, we find that the bankruptcy court properly looked to the PUC tariffs for guidance in determining the rate to be paid by the estate.

■ Next, we address National Fuel's contention that the actual and necessary cost and expense of preserving the estate under § 503(b) is presumptively the rate under the service agreement (the LIS rate). *See In re Thatcher Glass Corp.,* 59 B.R. 797, 799 (Bankr.D.Conn.1986) (contract rate presumed to be reasonable to measure value of post-petition goods); *In re Ram Mfg., Inc.,* 38 B.R. 252, 254 (Bankr.E.D.Pa.1984). In *In re Thatcher Glass,* the debtor corporation received gas service from People's Gas System, Inc. (PGS) under a contract rate discounted because of minimum purchase requirements and thus lower than the rate charged to other non-contract industrial users. When the debtor rejected the contract with PGS, it argued that the lower rate should still apply because the reasonable value of the natural gas provided by PGS was the value agreed to in the contract. *Id.* The court did not find conclusive the presumption that the contract rate should control because allowing payment at the lower rate would permit the debtor to reject the contract but maintain its benefits. *Id.* at 800 (citing *In re Italian Cook Oil Corp.,* 190 F.2d 994, 996–97 (3d Cir.1951) (trustee may not reject executory contracts and continue to receive benefit of contractual rate)). The court also noted that because natural gas is not a commodity available on the open market, "traditional means of determining its value are not available." *Id.* at 800. The court determined that the applicable rate should be what any other customer would have to pay under the same circumstances. *Id.*

In this case, National Fuel's other non-contract industrial customers would have paid the LVIS rate for natural gas during the relevant period. In the absence of the service agreement, the bankruptcy court found that Sharon would be eligible for service under the LVIS rate because the LVIS rate is the only tariff applicable to National Fuel's other large industrial customers. The bankruptcy court therefore held that payment for natural gas delivered during the course of its bankruptcy proceedings may be valued at the LVIS rate.

National Fuel claims that the record does not support a finding that the LVIS rate represents the reasonable value of National Fuel's gas service to Sharon during the course of Sharon's bankruptcy proceedings. In his affidavit, Howard Rose, Manager of Valuation at National Fuel, stated that Sharon's payment for fuel at the LVIS rate would result in "savings" to Sharon that would have to be recovered from National Fuel's other customers who are not involved in these proceedings. App. at 130a. This would occur because those customers charged at the LVIS rate obtain their own gas supplies, resulting in lesser "demand purchased gas costs," while Sharon uses National Fuel's gas supplies and thus incurs greater demand costs.[5] Rose stated that Sharon was charged under the higher LIS rate to allow National Fuel to recover Sharon's higher demand purchased gas costs. According to Rose, if Sharon were now allowed to switch to the LVIS rate schedule, National Fuel would file with the PUC to adjust rates to protect its other customers.

Rose's affidavit raises issues that the PUC may wish to consider in any petition brought by National Fuel to adjust Sharon's rate. Nevertheless, we find that the bankruptcy court did not err when it relied on the LVIS rate to value National Fuel's utility service to Sharon. During the rele-

---

**5.** Demand purchased gas costs represent the cost to National Fuel to have gas supplies available for customers regardless of the actual amount purchased. App. at 129a.

 

vant period, there were only two rate schedules—the LIS and LVIS rate schedules. In the absence of contrary evidence, the bankruptcy court properly found that Sharon would have been charged at the LVIS rate had the service agreement expired by its own terms in December 1987. Therefore, we find that the bankruptcy court's reliance on the only alternative filed rate, i.e. the LVIS rate, to value natural gas service to Sharon under § 503(b) was not clearly erroneous. *See Hassine v. Jeffes*, 846 F.2d 169, 174 (3d Cir.1988) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (appellate court should not disturb district court findings if district court's account of evidence is plausible in light of record viewed in entirety); *American Home Products Corp. v. Barr Laboratories, Inc.*, 834 F.2d 368, 370–71 (3d Cir. 1987).[6] We will affirm the court's finding that the value of natural gas provided to Sharon post-petition should be computed under the LVIS rate.

Finally, we believe that Sharon's payment for natural gas should be computed under the LVIS rate schedule from the time of the filing of the bankruptcy petition in this case. Under § 365, the trustee is given the discretion to reject an executory contract or unexpired lease of the debtor at any time before the confirmation of a plan. 11 U.S.C. § 365(d)(2). To hold the debtor to the contract rate for that portion of a rejected contract that has already been performed would compel the trustee in bankruptcy to reject executory contracts deemed detrimental to the estate immediately after the filing of the bankruptcy petition in order not to be held to the deleterious contract rate. Such an outcome would diminish the "breathing space" afforded the debtor to consider whether to reject or assume executory contracts under the Code. *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 898 (Bankr.E.D.Pa.1987).

**6.** We recognize that this finding might be characterized as an "ultimate fact," or a "legal concept with a factual component," *see Universal Minerals, Inc.*, 669 F.2d at 103, and, if so, would

## III.

For these reasons, we will affirm the district court on all issues.

Costs taxed against appellant.

receive plenary review, *id.* Even under this standard, we would still affirm the bankruptcy court based on our own review of the record.