**In re EXTRACTION TECHNOLOGIES OF VA, L.L.C., Debtor.**

No. 00–36730–T.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Sept. 28, 2001.

---

Paula Steinhilber Beran, Lynn L. Tavenner, Tavenner & Beran, PLC, Richmond, VA, for debtor.

Keith L. Phillips, Richmond, VA, trustee.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Chief Judge.

Hearing was held April 9, 2001, on debtor's motion to assume lease for a ReTech rotary grinder with lessor Sterling Business Credit Network Corporation (Sterling)[1] pursuant to 11 U.S.C. § 365(a). First Union National Bank, the indenture trustee of debtor's municipal bond financing, filed an objection to the motion. Sterling filed a response opposing First Union's objection. At the conclusion of hearing, the court took the motion under advisement and requested the parties to submit proposed findings of fact and conclusions of law, which have been received.

The issue is whether the transaction between debtor and Sterling is a true lease or a loan secured by a security interest in collateral. Because the court finds that the transaction is a security agreement the motion to assume must be denied.

### FINDINGS OF FACT.

#### Procedural History and Pleadings.

Debtor filed the motion to assume the grinder lease on March 6, 2001, stating that the grinder is vital for debtor's continued operations and reorganization. In its business debtor processes used plastic and turns it into granules that are then used as

---

**1.** Sterling is Winston Financial Group, Ltd.'s, successor-in-interest.

raw materials for other products. Without a grinder to replace the company's previously-failed machinery, the company cannot operate. The company anticipates being able to realize significant value from the grinder if the equipment lease with its amended, extended payment schedule is assumed. Debtor represents that it has provided adequate assurance to Sterling and that Sterling supports debtor's assumption of the lease.

*Facts.*

Debtor commenced operations around July 1998 when it purchased a plastics processing business as a supposed "turn-key" operation that was financed by industrial revenue bonds. Howard W. Blair is its chief operating officer and general manager. The bond financing was $9,600,000.00, most of which represented tax exempt bonds. First Union is the indenture trustee for the holders of the bonds.

One of the conditions imposed on debtor by the tax exempt bond financing was that it could not, without bondholder approval, hold "capitalizable" assets in excess of $10,000,000.00 for a period of three years from the financing date of July 1998.

From the bond proceeds debtor expended approximately $6,300,000.00 for plant and equipment, $850,000.00 for land and building and $500,000.00 for building improvements. Following its expenditures, debtor held capitalizable assets of approximately $9,700,000.00.

Included in the initial plant and equipment purchase was a plastics shredder and other equipment required in debtor's operations. From the outset debtor experienced problems with its equipment, and when these problems were not resolved it filed claims against the manufacturer. Beginning in 1999, these claims were the subject of arbitration proceedings. Debtor expected some financial recovery from the arbitration; in connection with its claims it was the holder of a $250,000.00 letter of credit drawn on a bank in New Orleans, La.

In August 2000, the original plastics shredder completely failed, and it became necessary for debtor to replace it. For this purpose, debtor negotiated with Sterling to finance the purchase of a new Re-Tech rotary grinder with accessories; the grinder operates as a large shredder of plastic materials. Sterling's business includes making high risk business loans in various forms. Debtor was unable to obtain commercial-based bank financing due to cash flow problems resulting from the failure of its equipment. The transaction was negotiated by Sterling W. Durham, the principal of Sterling, and Blair, debtor's chief executive.

The transaction between debtor and Sterling was designated by the parties as a lease, memorialized by a series of documents and amendments. The first were dated September 12, 2000, and included a "Lease Agreement" and "Lease Proposal Memorandum and Agreement." Amended documentation entitled "Amendment to Lease Proposal Memorandum Agreement" and "Redrafted Amendment to Lease Proposal Memorandum Agreement" were entered on September 27 and October 3, 2000, respectively. Finally, the parties entered into an amended "Lease Agreement" on October 3, 2000. All documents are incorporated in this opinion.

Debtor selected both the equipment and the vendor prior to requesting Sterling to purchase the equipment. Sterling paid for the equipment and the cost for a welding firm to install it in debtor's plant. The equipment and installation costs were paid for under three invoices in the total amount of $214,173.05. The equipment is

not permanently affixed to debtor's business premises and may be removed.

The amended lease agreement states explicitly that the parties' intent is for the transaction to constitute a "statutory finance lease" under Virginia's Uniform Commercial Code, Article 2A.[2] It provides that debtor "shall pay lessor ... rent for the use of the equipment" according to the following payment schedule:

| Date | Amount |
|------|--------|
| October 12, 2000 | $ 4,882.08 |
| November 12, 2000 | $ 4,882.08 |
| December 12, 2000 | $ 4,882.08 |
| January 15, 2001 | $125,000.00 |
| February 12, 2001 | $ 1,976.18 |
| March 12, 2001 | $ 1,976.18 |
| April 15, 2001 | $ 82,190.18 |

(Ex. 2, 5.) The total principal amount of the rent payments under the amended lease equates to the sum of the three invoices for equipment and installation, $214,173.05, plus interest of 13.19698%. In addition to the lease of the shredder, Sterling received from a debtor a security interest in the $250,000.00 letter of credit held by debtor in connection with the arbitration proceeding.

In summary, pertinent provisions of the instruments executed by the parties included the following:

(1) According to the initial documents dated September 12, 2000, the cost of the leased equipment is $157,500.00. A purchase opticn rider was attached to the initial September 12, 2000, lease agreement, which stated that lessee shall have an option to purchase the equipment for a price of $150,000.00. Additionally, paragraph 25 of the lease agreement form stated that if there has been no default and the lease has not been earlier terminated, lessee may purchase the equipment upon termination for the amount shown on an option form to be attached; if no amount is shown the purchase price will be fair market value. The second page of the lease proposal memorandum and agreement states in part as follows:

ADDITIONAL TERMS:

As an accommodation to ETVA, LLC Winston [Sterling] will agree to allow an Early Termination of the lease after 180 days and upon receipt of 60 days written notice.

Recognizing that Winstons' leases are non-cancelable and that Early Termination Options are not standard procedure, it is agreed that Winston should be compensated for this accommodation in the fee amount of $10,000.00. This fee shall be paid upon the execution of lease documents and is non-refundable whether or not the Option is exercised.

Further consideration for the fee is to compensate Winston for its agreement (subject only to Winstons' discretion) to give up its' ownership of the ReTech Equipment being acquired with the lease proceeds in consideration for accepting a Letter of Credit (satisfactory to Winston Financial Group, Ltd. in its' sole discretion) as lease collateral until the Lease or Letter of Credit matures, whichever shall first occur. It is anticipated that the Letter of Credit and the Lease shall be co-terminus and that upon maturity, the Letter of Credit proceeds shall be applied against the unpaid lease balance. Any remaining lease balance shall immediately be paid to Winston by Extraction Technologies of VA, LLC.

·  ·  ·  ·  ·

(Pl.Ex. 2.)

(2) The amendment instrument dated September 27, 2000, increased "the fi-

---

**2.** In testimony at hearing, Durham referred to the transaction as a true lease, which he said was the only option presented from the beginning of the parties' negotiations. Durham also testified that he and Blair reached a clear understanding of what the financial transaction was to be.

nanced equipment cost" to $214,173.05 and set out a payment schedule; it also stated that the purchase option is "pegged at $80,000.00 as of 4/15/01." (Ex. 2.)

(3) The amendment instrument dated October 3, 2000, amended the payment schedule to the seven payments set out in the schedule above. It is also stated that the purchase option is "pegged at $82,190.08," which is the same scheduled payment due April 15, 2001. The amended lease agreement of October 3, 2000, is identical to the form of the original lease agreement of September 12, except that it has attached to it the revised schedule of seven payments. (Ex. 2, 5.)

Sterling filed UCC financing statements noticing the lease transaction with debtor and its security interest in the letter of credit. The financing statements did not state that Sterling held a security interest pursuant to a lease.

Additional findings of fact are included in the discussion portion of this opinion.

### POSITION OF THE PARTIES.

#### Debtor.

According to debtor, the Sterling transaction is a true lease; it is not a financing instrument because it provides for a purchase option at the end of the payment stream for an appropriate amount of $82,190.08. Debtor relies in substantial part on the testimony of Blair and Durham as to what they intended in the transaction. Blair testified that he was knowl-

edgeable about satisfying requirements of industrial bond financing and that debtor was not in a position to acquire the equipment without a lease because it could not otherwise comply with the bond capitalization limit.

Debtor and Sterling both assert that debtor was not required to make the final payment of $82,190.08 shown in the lease schedule. Rather this represented debtor's purchase option payment, which debtor always intended to exercise.

#### First Union.

First Union's position is that, regardless of form, the Sterling lease transaction is a loan to debtor secured by a security interest in the debtor's equipment. Thus the agreement is not a lease assumable under 11 U.S.C. § 365(a). Instead, it is governed by the security interest provisions of the Virginia Code. *See* Va.Code Ann. § 8.1–201(37) (Michie 2001).

First Union advances several basic arguments in support of its position. These include the following:

(1) In reality there is no purchase option under the lease. Rather the so-called purchase option price is merely the final payment under the lease. Debtor and Sterling intended at all times that ownership would vest with debtor and merely assumed there would be bondholder approval. First Union points to the strange coincidence that the purchase option amount was equal to the costs of the equipment, installation[3] and accrued interest and questions the due diligence[4]

---

**3.** Sterling paid $56,000.00 to install the grinder, and Durham testified that it would be reasonable to expect $56,000.00 in removal costs plus an additional $56,000.00 to reinstall the equipment.

**4.** Bob Gilmore, salesperson for equipment manufacturer ReTech testified in deposition that no representative from Sterling or debtor ever approached the manufacturer at the time

of purchase or before debtor filed bankruptcy to ask what the fair market or residual values of the equipment would be. Gilmore testified that if the equipment was in good condition, the residual value would be about $125,000.00. On the other hand, Durham testified that he spoke with Gilmore at inception of the transaction as to what the equipment value would be at the end of the lease

that Sterling conducted to arrive at such convenient figures. First Union asserts that the stream of seven payments under the agreement for repayment and profit for Sterling for its costs to purchase and install the grinder were not merely happenstance. It is incredible for anyone to believe that a sophisticated financing business would enter into a six-month lease of high cost equipment with a life span of six to seven years and not intend to permanently sell the equipment.

Because there is no purchase option, the agreement is governed by security interest provisions of Virginia Code § 8.1–201(37)(1).

(2) Designated rental payments are loan payments.[5]

(3) Under the proposed revisions to the agreement that are to be made if the court approves assumption, debtor would end up paying at least $278,549.40 for equipment purchased by Sterling in September 2000 for a significantly lower price. Debtor's assumption of the lease would burden the estate with additional administrative expense to retain the equipment and is not in the best interests of the debtor or the estate.

(4) The debtor's position stated in testimony by Blair that the form of the transaction was determined in light of a limit on capitalization under debtor's municipal bond financing is not proven by probative evidence. Moreover, this issue is not relevant.

(5) Sterling filed security interest financing statements for the transaction that did not indicate that a lease was involved. Its usual policy is to file financing statements for true leases and to designate them accordingly. Further evidence that the transaction was a security interest is Sterling's requiring additional collateralization in the letter of credit.

*Sterling.*

Sterling's position is aligned in support of debtor, with alteration in perspective from the outlook of a lessor. Sterling argues that the intent of the parties is a clear and important factor in the characterization of the transaction as a lease under Virginia Code § 8.1–201(37). The lease at issue plainly says that the intent of the parties was to create a financing lease. Blair disclosed the constraint that he could not enter into anything but a lease and Sterling understood that restriction and was willing to transact under those terms.

Other important factors include an early termination option that allows debtor to terminate the lease upon sixty days' written notice and a purchase option for a price intended by Sterling to be the fair market value of the equipment at the conclusion of the transaction.

Sterling disputes First Union's assertion that the lessee's acquisition of an equity

---

but that he did not consider residual value when he prepared the schedule in the amended agreement. Durham testified that he believed the fair market value of the equipment as of April 15, 2001, was $82,190.08, which equated to the exact amount of the last lease payment.

5. First Union asserts that the equipment rent is merely repayment of a principal amount borrowed from Sterling to acquire and install the equipment plus interest accrued over the seven-month agreement. The schedule of seven rent payments due from October 12, 2000, through April 15, 2001, range from $1,986.18 to $125,000.00; the lower payments are due in February and March 2001, and the highest payment is due in January 2001. The last rent payment due April 2001 is $82,190.08. Each of the payments, including the last one, consists of a principal amount plus interest accrued over the term of the lease until the date the particular rent becomes due.

interest in the equipment is the most important factor. The evidence shows debtor has no equity in the grinder and that the purchase option in the amount of $82,190.08 is not a merely nominal consideration. The proper analysis focuses on whether at the outset of the lease, the parties expected the goods to retain significant residual value at the end of the lease term and whether at the end of lease, the lessor retained an entrepreneurial stake in the value of the goods either through the possibility of a gain or risk of loss. Under Sterling's analysis, the reversionary interest in the grinder belongs to Sterling unless debtor chooses to exercise the purchase option.

### DISCUSSION AND CONCLUSIONS OF LAW.

■ Section 365(a) of the Bankruptcy Code authorizes a debtor with approval of the court to assume or reject an executory contract or unexpired lease if the action is a reasonable exercise of debtor's business judgment and benefits debtor's estate. *See* 11 U.S.C. § 365(a); *see also Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989). Section 365(a) provides a basis for the debtor's assumption or rejection of a true lease. It does not allow assumption of a conditional sale or any type of financing arrangement. *See In re Architectural Millwork of Va., Inc.*, 226 B.R. 551 (Bankr. W.D.Va.1998).

■ The issue here is whether the transaction between Sterling and debtor is an unexpired lease of the rotary grinder used by debtor in its business or a collateral security agreement. To reach this issue, the court must first interpret the ambiguous transaction documents.

To summarize, the transaction is based on original and amended lease agreements with a final date of October 3, 2000. The amendments were necessary to adjust the costs, and the final payment schedule was attached to the amended lease agreement. It required debtor to make three payments of $4,882.08 due respectively on October 12, November 12, and December 12, 2000; a payment of $125,000.00 due January 15, 2001; two payments of $1,976.18 due respectively on February 12 and March 12, 2001; and a final payment of $82,190.18 due April 15, 2001.

A purchase option rider was attached to the initial lease agreement, stating the lessee had the option to purchase the equipment for a price of $150,000.00. The agreement of October 3, 2000, denoted the purchase option price at $82,190.08, which is the same as the lease payment due April 15, 2001. Debtor and Sterling contend that debtor's making the final scheduled payment would in fact be the debtor's exercise of the purchase option.

The argument that the transaction is an assumable lease is based to a great extent on the testimony of Blair and Durham. They both testified that the transaction was intended to be a true lease and not a security agreement. In their view the purchase option allows debtor to purchase the equipment at its approximate fair market value.

Blair testified that by exercising the option, debtor would own the grinder at the end of the transaction; the parties did not contemplate that Sterling would reacquire and remove the grinder. He stated that while debtor was not required to make the final lease payment, he hoped that it would be able to do so. Debtor was in dire financial straits, and without a lease arrangement it could not comply with the bond capitalization limit of $10,000,000.00.

Durham concurred that it was Blair's intention that debtor would own the grinder by exercising the option. Durham

hoped that Sterling would not have to remove the equipment; however, if debtor did not pay, that was always a possibility. Durham said that debtor had made two payments under the agreement, and Blair had not indicated whether debtor was going to exercise the purchase option. In support of his view that the transaction was a true lease, Durham pointed to the early termination option given the lessee in the initial series of documents and for which debtor paid $10,000.00.

Debtor and Sterling both noted the effect that debtor's bond financing of July 1998 had on the transaction. The bond cap required them to structure the grinder acquisition as a true lease. However, they both acknowledged that debtor's exercise of a purchase option prior to July 2001 would have required bondholder approval, and it was anticipated that approval would be sought.

First Union urges the court to find that the lease agreement was not a lease but a security agreement as defined by the Virginia *UCC* provisions. First Union's principal argument is that there is no purchase option. The plain wording of the agreement requires debtor to make the seven payments provided on the final lease agreement, after which the grinder becomes property of debtor. The so-called purchase option merely refers to the final payment on the schedule.

■ State law determines the classification of the transaction as a true lease or security agreement. *See In re Architectural Millwork of Va., Inc.*, 226 B.R. at 553. In particular, the Virginia Code defines a security agreement in the following manner:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation .... Whether a lease is intended as security is to be determined by the facts of each case; however,

(a) the inclusion of an option to purchase does not of itself make the lease one intended for security and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration *does make* the lease one intended for security. (Emphasis supplied.)

Va.Code Ann. § 8.1–201(37)(1) (Michie 2001).

As stated, the court must first interpret the lease agreement before the statutory analysis can be applied to the transaction. The differing views of the parties on provisions of the lease agreement have been noted in detail. The court finds that the provisions of the so-called purchase and early termination options contain the key to the designation of this transaction as either a lease or security agreement. While First Union says there is no purchase option, debtor and Sterling would treat the option at face value. The latter position is based on the premise, supported by Blair and Durham, that debtor had no obligation to make the final lease payment of $82,190.18 due April 15, 2001. Their further rationale seems to be that if debtor was not required to make the final payment, it would, in fact, be exercising the option by doing so.

The court has been unable to find in the trial transcript that either Blair or Durham ever specifically pointed to language in the documents excusing debtor from its clear obligation to make all seven lease payments. The court can only presume that their testimony was based on the early termination provision contained on a separate page of the initial lease proposal memorandum and agreement of September 12, 2000. Pertinent parts of this provi-

sion are set out under the court's findings of fact. In summary, it states that Sterling "will agree to allow an Early Termination of the lease after 180 days and upon receipt of 60 days written notice." The remainder of the page contains very ambiguous provisions relating primarily to the letter of credit debtor put up as additional lease collateral. There is no language clearly setting out what effect the debtor's election to terminate would have on sums remaining due under the lease. However, the gist of the provision suggests that in the event of termination, the letter of credit would be applied toward obligations remaining payable. It is not clear that a letter of credit acceptable to Sterling had been presented.

By the court's calculation, the 180 day early termination option could have been exercised by debtor on or after March 11, 2001. Following Blair's and Durham's logic, on this date debtor could actually have avoided making the final two payments. Of course, debtor has not elected to terminate the lease.

The existence of the letter of credit as additional security for the lease creates further confusion as to what the parties intended. At best, the transaction was part lease, part security agreement, and debtor's assumption would require substantial revision of the parties' agreement.

The court concludes that, absent debtor's election to terminate, there is nothing in the early termination clause or elsewhere in the lease agreement excusing debtor from making the full seven payments required under the lease. Debtor had the option either to terminate the lease after 180 days or remain liable for the seven lease payments. It chose the latter. Merely because the parties referred to the payment due April 15, 2001, as the payment of an option to purchase does not make it an option payment. It

was simply the final payment. Moreover, the option language makes it clear that upon payment of the full schedule, debtor would be the owner of the equipment.

Further evidence of the illusory nature of the purchase option is supplied by the payment schedule itself. Despite Durham's testimony that the final, "option" payment was intended to equate to fair market value of the equipment, it is obvious that the lease payments are geared to the total cost of the equipment, $214,173.05, plus interest representing Sterling's profit in the transaction. As First Union argues, this cannot be a coincidence. In other words, the equipment rent is merely repayment of a principal sum with interest accrued over seven payments.

Under the lease agreement, debtor was obligated to make seven payments, after which it would own the lease collateral. Thus, the transaction falls within the provision of § 8.1–201(37)(1) stating that a lease is "one intended for security" if upon lessee's compliance with the terms of the lease it has the option to become owner for no additional consideration.

The court's conclusion is supported by a recent decision of the Supreme Court of Virginia, which ruled that "[t]he plain language of the statute [Virginia Code § 8.1–201(37)(1) ] creates a security interest in property as a matter of law if the parties' contract allows the lessee to become the owner of the leased property for nominal or no additional consideration upon compliance with the terms of the lease." *C.F. Garcia Enters. v. Enterprise Ford Tractor, Inc.,* 253 Va. 104, 107, 480 S.E.2d 497 (1997). This court has recently discussed this issue extensively in *In re Smith,* 262 B.R. 365, 368–369 (Bankr.E.D.Va.2000), where a similar result was reached. *See also In re Architectural Millwork of Va., Inc.,* 226 B.R. at 553–554.

Finally, Sterling has argued that the intent of the parties to structure a lease is an important factor in the characterization of the transaction as a lease under § 8.1–201(37). The court does not doubt their intent. Indeed, the only relevance of the bond cap argument is that it supports the testimony of Blair and Sterling that they believed a true lease was required and that they actually attempted to craft the transaction as a lease. On the other hand, it can be argued that the intent of the parties was for debtor to make the scheduled lease payments and own the equipment. However, the parties' intent does not carry the same weight as it might have under prior law. Since the 1991 amendments to Article 2A of the *UCC*, as enacted by the Virginia legislature in the present statute, the focus is on the prescribed economic factors rather than on intent of the parties.

Because the court finds that the lease agreement is not a true lease but is a security agreement, it is not subject to assumption under Bankruptcy Code § 365(a), and the debtor's motion must be denied.[6]

A separate order will be entered.

**6.** Also, because the court finds that the issue in this case is resolved by § 8.1–201(37)(1), it is unnecessary to consider the other subparagraphs of this section.